# Exhibit A
## (Proof of Claim)

B10 (Official Form 10) (04/13)

| UNITED STATES BANKRUPTCY COURT **Eastern** DISTRICT OF **New York** | PROOF OF CLAIM |
|---|---|

| Name of Debtor:<br>**Geoffrey M. James** | Case Number:<br>**14-44597** | |
|---|---|---|

*NOTE: Do not use this form to make a claim for an administrative expense that arises after the bankruptcy filing. You may file a request for payment of an administrative expense according to 11 U.S.C. § 503.*

Name of Creditor (the person or other entity to whom the debtor owes money or property):

**Flushing Bank f/k/a Flushing Savings Bank, FSB**

| | COURT USE ONLY |
|---|---|
| Name and address where notices should be sent:<br>Jaspan Schlesinger LLP<br>300 Garden City Plaza<br>Garden City, NY  11530  Attn: Antonia M. Donohue<br><br>Telephone number:    email:<br>(516) 393-8217 | ☐ Check this box if this claim amends a previously filed claim.<br><br>**Court Claim Number:** _____<br>*(If known)*<br><br>Filed on: _____ |
| Name and address where payment should be sent (if different from above):<br><br><br><br>Telephone number:    email: | ☐ Check this box if you are aware that anyone else has filed a proof of claim relating to this claim. Attach copy of statement giving particulars. |

**1. Amount of Claim as of Date Case Filed:**    $_____776,022.68

If all or part of the claim is secured, complete item 4.

If all or part of the claim is entitled to priority, complete item 5.

☑ Check this box if the claim includes interest or other charges in addition to the principal amount of the claim. Attach a statement that itemizes interest or charges.

**2. Basis for Claim:** Note and Mortgage
(See instruction #2)

| 3.  Last four digits of any number by which creditor identifies debtor: | 3a. Debtor may have scheduled account as: | 3b. Uniform Claim Identifier (optional): |
|---|---|---|
| | (See instruction #3a) | (See instruction #3b) |

**4. Secured Claim** (See instruction #4)
Check the appropriate box if the claim is secured by a lien on property or a right of setoff, attach required redacted documents, and provide the requested information.

**Nature of property or right of setoff:** ☑ Real Estate  ☐ Motor Vehicle  ☐ Other
**Describe:**

**Value of Property:** $_____

**Annual Interest Rate** 24.00 % ☑ Fixed  or ☐ Variable
**(when case was filed)**

Amount of arrearage and other charges, as of the time case was filed, included in secured claim, if any:

$_____241,788.92

**Basis for perfection:** Recorded mortgage _____

**Amount of Secured Claim:** $ 776,022.68 _____

**Amount Unsecured:** $_____

**5. Amount of Claim Entitled to Priority under 11 U.S.C. § 507 (a).** If any part of the claim falls into one of the following categories, check the box specifying the priority and state the amount.

☐ Domestic support obligations under 11 U.S.C. § 507 (a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $12,475*) earned within 180 days before the case was filed or the debtor's business ceased, whichever is earlier – 11 U.S.C. § 507 (a)(4).

☐ Contributions to an employee benefit plan – 11 U.S.C. § 507 (a)(5).

☐ Up to $2,775* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. § 507 (a)(7).

☐ Taxes or penalties owed to governmental units – 11 U.S.C. § 507 (a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. § 507 (a)(___).

**Amount entitled to priority:**

$_____

*Amounts are subject to adjustment on 4/01/16 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.

**6. Credits.** The amount of all payments on this claim has been credited for the purpose of making this proof of claim. (See instruction #6)

B10 (Official Form 10) (04/13)

2

**7. Documents:** Attached are **redacted** copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, security agreements, or, in the case of a claim based on an open-end or revolving consumer credit agreement, a statement providing the information required by FRBP 3001(c)(3)(A). If the claim is secured, box 4 has been completed, and **redacted** copies of documents providing evidence of perfection of a security interest are attached. If the claim is secured by the debtor's principal residence, the Mortgage Proof of Claim Attachment is being filed with this claim. *(See instruction #7, and the definition of "redacted".)*

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain.

**8. Signature:** (See instruction #8)

Check the appropriate box.

☑ I am the creditor.   ☐ I am the creditor's authorized agent.   ☐ I am the trustee, or the debtor, or their authorized agent. (See Bankruptcy Rule 3004.)   ☐ I am a guarantor, surety, indorser, or other codebtor. (See Bankruptcy Rule 3005.)

I declare under penalty of perjury that the information provided in this claim is true and correct to the best of my knowledge, information, and reasonable belief.

Print Name: Joanne Oreili
Title: Senior Vice President
Company: Flushing Bank f/k/a Flushing Savings Bank, FSI
Address and telephone number (if different from notice address above):               (Signature)                    9/25/14   (Date)

(516) 393-8217
Telephone number:          email:

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

---

**INSTRUCTIONS FOR PROOF OF CLAIM FORM**

*The instructions and definitions below are general explanations of the law. In certain circumstances, such as bankruptcy cases not filed voluntarily by the debtor, exceptions to these general rules may apply.*

**Items to be completed in Proof of Claim form**

**Court, Name of Debtor, and Case Number:**
Fill in the federal judicial district in which the bankruptcy case was filed (for example, Central District of California), the debtor's full name, and the case number. If the creditor received a notice of the case from the bankruptcy court, all of this information is at the top of the notice.

**Creditor's Name and Address:**
Fill in the name of the person or entity asserting a claim and the name and address of the person who should receive notices issued during the bankruptcy case. A separate space is provided for the payment address if it differs from the notice address. The creditor has a continuing obligation to keep the court informed of its current address. See Federal Rule of Bankruptcy Procedure (FRBP) 2002(g).

**1. Amount of Claim as of Date Case Filed:**
State the total amount owed to the creditor on the date of the bankruptcy filing. Follow the instructions concerning whether to complete items 4 and 5. Check the box if interest or other charges are included in the claim.

**2. Basis for Claim:**
State the type of debt or how it was incurred. Examples include goods sold, money loaned, services performed, personal injury/wrongful death, car loan, mortgage note, and credit card. If the claim is based on delivering health care goods or services, limit the disclosure of the goods or services so as to avoid embarrassment or the disclosure of confidential health care information. You may be required to provide additional disclosure if an interested party objects to the claim.

**3. Last Four Digits of Any Number by Which Creditor Identifies Debtor:**
State only the last four digits of the debtor's account or other number used by the creditor to identify the debtor.

**3a. Debtor May Have Scheduled Account As:**
Report a change in the creditor's name, a transferred claim, or any other information that clarifies a difference between this proof of claim and the claim as scheduled by the debtor.

**3b. Uniform Claim Identifier:**
If you use a uniform claim identifier, you may report it here. A uniform claim identifier is an optional 24-character identifier that certain large creditors use to facilitate electronic payment in chapter 13 cases.

**4. Secured Claim:**
Check whether the claim is fully or partially secured. Skip this section if the

claim is entirely unsecured. (See Definitions.) If the claim is secured, check the box for the nature and value of property that secures the claim, attach copies of lien documentation, and state, as of the date of the bankruptcy filing, the annual interest rate (and whether it is fixed or variable), and the amount past due on the claim.

**5. Amount of Claim Entitled to Priority Under 11 U.S.C. § 507 (a).**
If any portion of the claim falls into any category shown, check the appropriate box(es) and state the amount entitled to priority. (See Definitions.) A claim may be partly priority and partly non-priority. For example, in some of the categories, the law limits the amount entitled to priority.

**6. Credits:**
An authorized signature on this proof of claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

**7. Documents:**
Attach redacted copies of any documents that show the debt exists and a lien secures the debt. You must also attach copies of documents that evidence perfection of any security interest and documents required by FRBP 3001(c) for claims based on an open-end or revolving consumer credit agreement or secured by a security interest in the debtor's principal residence. You may also attach a summary in addition to the documents themselves. FRBP 3001(c) and (d). If the claim is based on delivering health care goods or services, limit disclosing confidential health care information. Do not send original documents, as attachments may be destroyed after scanning.

**8. Date and Signature:**
The individual completing this proof of claim must sign and date it. FRBP 9011. If the claim is filed electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what constitutes a signature. If you sign this form, you declare under penalty of perjury that the information provided is true and correct to the best of your knowledge, information, and reasonable belief. Your signature is also a certification that the claim meets the requirements of FRBP 9011(b). Whether the claim is filed electronically or in person, if your name is on the signature line, you are responsible for the declaration. Print the name and title, if any, of the creditor or other person authorized to file this claim. State the filer's address and telephone number if it differs from the address given on the top of the form for purposes of receiving notices. If the claim is filed by an authorized agent, provide both the name of the individual filing the claim and the name of the agent. If the authorized agent is a servicer, identify the corporate servicer as the company. Criminal penalties apply for making a false statement on a proof of claim.

B10 (Official Form 10) (04/13)

3

_____DEFINITIONS_____         _____INFORMATION_____

**Debtor**
A debtor is the person, corporation, or other entity that has filed a bankruptcy case.

**Creditor**
A creditor is a person, corporation, or other entity to whom debtor owes a debt that was incurred before the date of the bankruptcy filing. See 11 U.S.C. §101 (10).

**Claim**
A claim is the creditor's right to receive payment for a debt owed by the debtor on the date of the bankruptcy filing. See 11 U.S.C. §101 (5). A claim may be secured or unsecured.

**Proof of Claim**
A proof of claim is a form used by the creditor to indicate the amount of the debt owed by the debtor on the date of the bankruptcy filing. The creditor must file the form with the clerk of the same bankruptcy court in which the bankruptcy case was filed.

**Secured Claim Under 11 U.S.C. § 506 (a)**
A secured claim is one backed by a lien on property of the debtor. The claim is secured so long as the creditor has the right to be paid from the property prior to other creditors. The amount of the secured claim cannot exceed the value of the property. Any amount owed to the creditor in excess of the value of the property is an unsecured claim. Examples of liens on property include a mortgage on real estate or a security interest in a car. A lien may be voluntarily granted by a debtor or may be obtained through a court proceeding. In some states, a court judgment is a lien.

A claim also may be secured if the creditor owes the debtor money (has a right to setoff).

**Unsecured Claim**
An unsecured claim is one that does not meet the requirements of a secured claim. A claim may be partly unsecured if the amount of the claim exceeds the value of the property on which the creditor has a lien.

**Claim Entitled to Priority Under 11 U.S.C. § 507 (a)**
Priority claims are certain categories of unsecured claims that are paid from the available money or property in a bankruptcy case before other unsecured claims.

**Redacted**
A document has been redacted when the person filing it has masked, edited out, or otherwise deleted, certain information. A creditor must show only the last four digits of any social-security, individual's tax-identification, or financial-account number, only the initials of a minor's name, and only the year of any person's date of birth. If the claim is based on the delivery of health care goods or services, limit the disclosure of the goods or services so as to avoid embarrassment or the disclosure of confidential health care information.

**Evidence of Perfection**
Evidence of perfection may include a mortgage, lien, certificate of title, financing statement, or other document showing that the lien has been filed or recorded.

**Acknowledgment of Filing of Claim**
To receive acknowledgment of your filing, you may either enclose a stamped self-addressed envelope and a copy of this proof of claim or you may access the court's PACER system (www.pacer.psc.uscourts.gov) for a small fee to view your filed proof of claim.

**Offers to Purchase a Claim**
Certain entities are in the business of purchasing claims for an amount less than the face value of the claims. One or more of these entities may contact the creditor and offer to purchase the claim. Some of the written communications from these entities may easily be confused with official court documentation or communications from the debtor. These entities do not represent the bankruptcy court or the debtor. The creditor has no obligation to sell its claim. However, if the creditor decides to sell its claim, any transfer of such claim is subject to FRBP 3001(e), any applicable provisions of the Bankruptcy Code (11 U.S.C. § 101 et seq.), and any applicable orders of the bankruptcy court.

Bankruptcy Petition No.: 14-44597

Chapter 13

Debtor:   Geoffrey James

Loan no. xxxxxx2684

| | | |
|---|---|---|
| Principal Balance | $ | 539,627.44 |
| Interest at 7.125% (5/1/13-9/9/14) | $ | 52,119.05 |
| Default Interest at 16.8750%(06/1/13-9/9/14) | $ | 115,851.27 |
| Unpaid NSF Fees | $ | 100.00 |
| Escrow Deficit | $ | 17,372.08 |
| Unpaid Late Charges | $ | 16,228.14 |
| 1% Prepayment Fee | $ | 5,396.27 |
| Property Inspection Fee | $ | 594.00 |
| Recording Fee | $ | 175.00 |
| Legal Fees and Costs | $ | 28,559.43 |
| **Total Amount to Pay Loan in Full** | $ | 776,022.68 |

Arrears:

| | | |
|---|---|---|
| 16 Payments at $3,915.88 | $ | 62,654.08 |
| Default Interest Due | $ | 112,592.49 |
| Escrow Due | $ | 18,835.12 |
| 2 Month Escrow Cushion | $ | 2,225.66 |
| Unpaid Late Charges | $ | 16,228.14 |
| Property Inspection Fee | $ | 594.00 |
| NSF/Other Fees | $ | 100.00 |
| Attorney Fees and Costs | $ | 28,559.43 |
| Total: | $ | 241,788.92 |

EXC/D989756v1/M063832/C0142140

Mortgage No.

Dated: April 6 2007

## ADJUSTABLE RATE MORTGAGE NOTE
### (5+5+5+5+5 ARM/30 YR. AMORTIZATION)

**$581,250.00**

Flushing, New York

FOR VALUE RECEIVED, GEOFFREY JAMES, residing at 116-24 140TH STREET, JAMAICA NEW YORK 11436 promises to pay to the order of FLUSHING SAVINGS BANK, FSB (the "Lender"), a corporation organized and existing under and by virtue of the laws of the United States, in immediately available funds and in lawful money of the United States, at **Flushing Savings Bank, FSB, P.O. Box 4512, Woburn, MA 01888-4512** or such other place as the holder hereof may from time to time designate in writing, the sum FIVE HUNDRED EIGHTY ONE THOUSAND TWO HUNDRED FIFTY 00/100 DOLLARS ($581,250.00), which as now exists or may hereafter be reduced is referred to below as the "Principal Sum" or the "Loan", together with interest thereon from the date hereof at the rates set forth herein and in accordance with the terms and conditions hereof.

(i)    Interest

From the date hereof until **May 1, 2012** (the "First Adjustment Date"), the outstanding sum on this Note shall bear interest at an annual rate of interest equal at all times to **7.125%**.

On the First Adjustment Date until the fifth (5th) anniversary date of the First Adjustment Date ("Second Adjustment Date"), the interest rate shall be adjusted to an annual rate of interest (the "First Adjusted Interest Rate") equal at all times to the greater of (i) **7.125%** or (ii) 225 basis points in excess of the Bank's cost of borrowing five (5) year money from the Federal Home Loan Bank of New York, as determined by the Bank, as of sixty (60) days prior to the First Adjustment Date.

On the Second Adjustment Date until the tenth (10th) anniversary date of the First Adjustment Date (the "Third Adjustment Date"), the interest rate shall be adjusted to an annual rate of interest (the "Second Adjusted Interest Rate") equal at all times to the greater of (i) the First Adjusted Interest Rate or (ii) 225 basis points in excess of the Bank's cost of borrowing five (5) year money from the Federal Home Loan Bank of New York, as determined by the Bank, as of sixty (60) days prior to the Second Adjustment Date.

On the Third Adjustment Date until the fifteenth (15th) anniversary date of the First Adjustment Date (the "Fourth Adjustment Date"), the interest rate shall be adjusted to an annual rate of interest (the "Third Adjusted Interest Rate") equal at all times to the greater of (i) the Second Adjusted Interest Rate or (ii) 225 basis points in

1

excess of the Bank's cost of borrowing five (5) year money from the Federal Home Loan Bank of New York, as determined by the Bank, as of sixty (60) days prior to the Third Adjustment Date.

On the Fourth Adjustment Date until the twentieth (20th) anniversary date of the First Adjustment Date (the "Fifth Adjustment Date"), the interest rate shall be adjusted to an annual rate of interest (the "Fourth Adjusted Interest Rate") equal at all times to the greater of (i) the Third Adjusted Interest Rate or (ii) 225 basis points in excess of the Bank's cost of borrowing five (5) year money from the Federal Home Loan Bank of New York, as determined by the Bank, as of sixty (60) days prior to the Fourth Adjustment Date.

On the Fifth Adjustment Date until **May 1, 2037** or the twenty fifth (25th) anniversary date of the First Adjustment Date (the "Maturity Date"), the interest rate shall be adjusted to an annual rate of interest (the "Fifth Adjusted Interest Rate") equal at all times to the greater of (i) the Fourth Adjusted Interest Rate or (ii) 225 basis points in excess of the Bank's cost of borrowing five (5) year money from the Federal Home Loan Bank of New York, as determined by the Bank, as of sixty (60) days prior to the Fifth Adjustment Date.

If the Federal Home Loan Bank of New York line of borrowing is not available the Bank will choose a similar index for the interest on this Note.

If the Note is signed on any day other than the first day of the month, a payment for interest for the period from the date hereof through and including the last day of the month shall be due and payable on the date hereof ("Short Term Interest"). Short Term Interest shall be calculated on a factor based on the actual number of days elapsed divided by 360. Thereafter, interest shall be payable on the first day of each month in arrears beginning **June 1, 2007** and shall be calculated on the outstanding principal balance from time to time and based upon a year of 360 days and a thirty (30) day month.

ii.    Principal Payments

The outstanding principal shall be payable in three hundred sixty (360) monthly payments of principal and interest beginning on **June 1, 2007** and continuing on the first day of each month thereafter. The first sixty (60) installments of principal and interest shall be equal to **$3,915.99** (which was calculated in accordance with a thirty (30) year amortization schedule). The sixty-first (61st) through the one hundred twentieth (120th) Installment shall be recalculated on the First Adjustment Date based upon the First Adjusted Interest Rate and an amortization schedule of twenty five (25) years. The one hundred twenty-first (121st) through the one hundred eightieth (180th) installment shall be recalculated on the Second Adjustment Date based upon the Second Adjusted Interest Rate and an amortization schedule of twenty (20) years. The one hundred eighty-first (181st) through the two hundred fortieth (240th)

2

installment shall be recalculated on the Third Adjustment Date based upon the Third Adjusted Interest Rate and an amortization schedule of fifteen (15) years. The two hundred forty-first (241st) through the three hundredth (300th) installment shall be recalculated on the Fourth Adjustment Date based upon the Fourth Adjusted Interest Rate and an amortization schedule of ten (10) years. The three hundred first (301st) through the three hundred fifty ninth (359th) installment be recalculated on the Fifth Adjustment Date based upon the Fifth Adjusted Interest Rate and an amortization schedule of five (5) years. The final installment shall equal all outstanding principal and all accrued and unpaid interest which shall be due and payable on the Maturity Date.

    iii.  <u>Payments.</u>

Notwithstanding anything to the contrary contained herein, any monthly payment of principal and interest that is received before its due date shall not be credited until its due date and any full or partial prepayment, if permitted, shall not be applied until the first day of the next month following the month of payment and Maker shall not receive interest on any funds while being held by Lender prior to crediting same nor shall Maker be entitled to any interest on the amount prepaid.

If any payment of principal or interest becomes due on a day on which banks in the City and State of New York are required or permitted by law to remain closed, such payment shall be made on the next succeeding Business Day. Any such extension of time shall be included in computing interest in connection with such payment.

    iv.    <u>Prepayments.</u>

Maker shall have the right to prepay the Loan as follows:

(a) For the period beginning on the date of this Note until (and excluding) the first anniversary of the date of this Note, full or partial prepayment is permitted provided the Maker provides the Lender with 60 days prior written notice and pays to the Lender together with the prepayment a sum equal to five (5%) percent of the amount of such prepayment.

(b) For the period from and including the first anniversary of the date of this Note until (and excluding) the second anniversary of the date of this Note, full or partial prepayment is permitted provided the Maker provides the Lender with 60 days prior written notice and pays to the Lender together with the prepayment a sum equal to four (4%) percent of the amount of such prepayment.

(c) For the period from and including the second anniversary of the date of this Note until (and excluding) the third anniversary of the date of this Note, full or partial prepayment is permitted provided the Maker provides the Lender with 60 days prior

3

written notice and pays to the Lender together with the prepayment a sum equal to three (3%) percent of the amount of such prepayment.

(d) For the period from and including the third anniversary of the date of this Note until (and excluding) the fourth anniversary of the date of this Note, full or partial prepayment is permitted provided the Maker provides the Lender with 60 days prior written notice and pays to the Lender together with the prepayment a sum equal to two (2%) percent of the amount of such prepayment.

(e) For the period from and including the fourth anniversary of the date of this Note until the Maturity Date, full or partial prepayment is permitted provided the Maker provides the Lender with 60 days prior written notice and pays to the Lender together with the prepayment a sum equal to one (1%) percent of the amount of such prepayment.

Any partial prepayments permitted hereunder shall be applied in the inverse order of maturity.

All sums payable pursuant to the provisions set forth herein shall also be due and payable by Maker upon demand in the event of any involuntary prepayments or any acceleration of the Loan. In addition, if the Maturity Date occurs as a result of a default by Maker under the Note or any of the Loan Documents and Maker tenders payment of the Loan or any part thereof to the Lender, such tender shall constitute an evasion of the prepayment provisions and shall be deemed to be a voluntary prepayment which shall require the payment by Maker of a penalty to be imposed by Lender.

## AND THE MAKER FURTHER HEREBY EXPRESSLY AGREES WITH THE LENDER AS FOLLOWS:

1.    In the event that any payment shall become overdue for a period of 15 days, a late charge equal to eight (8.00%) percent or such lesser amount as may be permitted by law of the total monthly payment of principal, interest and escrow so overdue may be charged by the Lender for the purpose of defraying the expense incident to handling such delinquent payment.

2.    Lender may charge and Maker agrees to pay reasonable fees and costs for the services of Lender and its agents in processing any ownership transfer on its records, fire loss payments, checks returned dishonored or unpaid, substitution of obligors, releases, modifications, extensions, consents, special agreements, assignments, reduction certificates and certificates of mortgage.

3. Any interest due under this Note which shall be outstanding more than 15 days beyond the due date thereof, or any unpaid charges due or any advances made by Lender out of its own funds for charges or taxes and any unpaid interest charges thereon from an earlier month shall bear interest at the interest rate provided in the

4

Note until paid or up to and including judgment of foreclosure. Nothing in this paragraph shall operate or be construed to prevent Lender from exercising its default rights under the Mortgage. This paragraph shall not be effective if the principal balance of this loan on the date of this instrument is less than $250,000.00 or if the property securing this mortgage is a 1-2 family owner-occupied house.

4.     This Note is secured by, inter alia, a mortgage made by the Maker to the Lender of even date herewith, on real property (the "Premises") known **718 PENNSYLVANIA AVENUE, BROOKLYN NEW YORK** 11207 located in **KINGS** County, State of New York, as more particularly described in said mortgage (the "Mortgage") and by an assignment by the Maker to the Lender of any and all leases affecting the Premises or any part thereof.

5.     The whole of the Principal Sum or any part thereof, and of any other sums of money secured by the Mortgage shall, forthwith or thereafter, at the option of the Lender, become due and payable if default be made in any payment under this Note, or upon the happening of any default which, by the terms of the Mortgage or any other instrument, document or agreement now or hereafter given to secure this Note (the Mortgage and all such other instruments, documents and agreements, being collectively, the "Loan Documents"), including any grace period set forth therein, shall entitle the Lender to declare the same, or any part thereof, to be due and payable; and all of the covenants, agreements, terms and conditions of the Loan Documents are hereby incorporated in this Note with the same force and effect as if herein set forth at length.

6.     If more than one person joins in the execution of this Note, the obligation shall be joint and several and the relative words herein shall be read as if written in the plural or if any be of the feminine sex, in the feminine gender, as the case may be.

7.     Presentment for payment, notice of dishonor, protest, and notice of protest are hereby waived by the Maker and by each endorser and guarantor of this Note.

8.     Any check, draft, money order or other instrument given in payment of all or any portion of this Note may be accepted by the Lender and handled in collection in the customary manner, but the same shall not constitute payment hereunder or diminish any rights of the Lender, except to the extent actual cash proceeds of such instruments are unconditionally received by the Lender and applied to the indebtedness in the manner provided in this Note.

9.     This Note may not be changed or modified orally, but only by an instrument in writing signed by the party against whom such change or modification is sought to be enforced.

10.     After any stated or accelerated maturity hereof, the Loan shall bear interest, payable on demand, at the default rate (the "Default Rate") set forth in the mortgage of even date herewith given by Maker to the Lender, but in no event more than the highest

5

rate permitted by the applicable usury law in respect of the Maker, until the unpaid balance of principal and interest shall have been paid in full. Notwithstanding anything to the contrary contained herein, the Lender shall be entitled to interest at the Default Rate (i) in the event of a default by the Maker under the mortgage or this Note, from the time of said default to the sale of the premises following foreclosure, (ii) on any deficiency judgment (iii) and from the stated Maturity Date of this Note.

This paragraph does not create any right on Maker's part to pay interest at the rate designated by Lender for the period following stated or accelerated maturity instead of making payment in full.

The Lender or any subsequent holder of this Note shall also be entitled to receive interest at the highest rate allowed by law on any claim filed by it pursuant to the United States Bankruptcy Code, as amended, to recover all or part of the amounts that may be due under this Note.

In the event the Maker defaults as set forth herein, there will be a default reinstatement fee of one (1%) percent of the then principal loan balance outstanding.

11. In the event that this Note is placed in the hands of an attorney for collection by reason of any default hereunder, or if a foreclosure action is commenced or if Lender is required to defend its rights hereunder or under the Mortgage or any documents executed in connection herewith, the Maker agrees to pay the Lender's reasonable attorneys, fees and expenses and all court costs of such actions and foreclosure actions.

12. This Note is and shall be deemed to have been made and delivered in the State of New York and in all respects shall be governed and construed in accordance with the laws of that State.

13. The Maker and any and all guarantors of this Note hereby irrevocably and unconditionally:
   (a) consent to the jurisdiction of the courts of the State of New York in any actions, suits, or proceedings arising out of or in connection with this Note (although this covenant shall not preclude an action on this Note by the Lender in any other appropriate jurisdiction);
   (b) waive any objection which the Maker may now or hereafter have to the laying of venue of any of the aforesaid actions, suits, or proceedings arising out of or in connection with this Note or the Loan Documents brought in any of the aforesaid courts;
   (c) waive the right to plead or claim that any such action suit, or proceeding brought in any such court has been brought in an inconvenient forum; and
   (d) waive the requirements of personal service in connection with any actions, suits, or proceedings arising out of or in connection with this Note or any of the Loan Documents, and consent that all service of process may be made by certified

6

mail, return receipt requested, addressed to the Maker at the address of the Maker set forth below, or at such address, for the Maker, as the Maker shall give to the Lender by written notice sent by certified mail, return receipt requested. Service so being deemed completed two (2) days after the same has been posted as aforesaid; and

      (e) waive the right, in litigation in which it and the Lender are adverse parties, to trial by jury and the right to assert any set-off or counterclaim of any nature or description.

14.    The word "Maker" shall include the Maker's representatives, successors and assigns and the word "Lender" shall include the Lender's representatives, successors and assigns.

15.    All notices or other communications required to be given pursuant to this Note shall be in writing and be deemed given, on the second business day of the Lender next following the deposit of such written notice or communication enclosed in a prepaid wrapper, certified mail, return receipt requested, in a post office or official depository under the care and custody of the United States Postal Service, properly addressed to the party to whom such notice or communication is addressed at the address set forth in the Mortgage of even date herewith given by Maker to the Lender or at such other address as either party may from time to time furnish to the other in the manner provided for notice hereof (for the purposes of such change of address notice, such notice shall be deemed completed only when actually received by the party to which it is addressed).

16.    The provisions of this Note are severable. If any clause or provision shall be held invalid or unenforceable, in whole or in part, then such invalidity or unenforceability shall affect only such clause or provision, or part thereof, and shall not in any manner affect any other clause or provision in this Note.

17.    No modification or waiver of or with respect to any provision of this Note, or consent by the Lender to any departure by the Maker from any of the terms or conditions hereof, shall, in any event, be effective unless it shall be in writing and executed by the Lender. Such waiver or consent shall, in any event, be effective only in the specific instance and for the purpose for which it was given. No notice to or demand on the Maker in any case shall, of itself, entitle the Maker to any other or further notice or demand in similar or other circumstances.

18.    No failure or delay by the Lender in exercising any right, power or privilege under this Note shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise of any such right, power or privilege.

19.    Each and every right granted to the Lender under this Note, and under all other agreements, documents or instruments executed by the Maker and delivered pursuant to or in connection with this Note which evidence or secure the indebtedness described herein or any other obligation of the Maker to the Lender arising as set forth therein, shall be cumulative and may be exercised by the Lender from time to time.

20. This Note, the Loan Documents and all other agreements, documents and instruments executed by the Maker and delivered pursuant to or in connection with this Note which evidence or secure the indebtedness described herein or any other obligation of the Maker to the Lender arising as set forth therein, contain the entire agreement between the Maker and the Lender relating to the subject matter hereof and thereof. The Maker expressly acknowledges that the Lender has not made and the Maker is not relying on any oral representations, agreements or commitments of the Lender or any officer, employee, agent or representative thereof.

IN PRESENCE OF:

_____

GEOFFREY JAMES

State of New York     )
County of QUEENS  ) ss.:

On the 6TH day of **April** in the year **2007** before me, the undersigned, personally appeared **GEOFFREY JAMES**, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____

Notary Public

Francine DiLeonardo
Notary Public State of New York
Certified in Nassau County
Io. 01DI6091571
Commission Expires 200_

8



## NYC DEPARTMENT OF FINANCE
## OFFICE OF THE CITY REGISTER

This page is part of the instrument. The City Register will rely on the information provided by you on this page for purposes of indexing this instrument. The information on this page will control for indexing purposes in the event of any conflict with the rest of the document.

2008041600001001001E290D

| RECORDING AND ENDORSEMENT COVER PAGE | | PAGE 1 OF 24 |
|---|---|---|
| Document ID: 2008041600001001 | Document Date: 04-06-2007 | Preparation Date: 04-16-2008 |

Document Type: MORTGAGE
Document Page Count: 23

| PRESENTER: | RETURN TO: |
|---|---|
| REGENT ABSTRACT SERVICES-15453<br>1399 FRANKLIN AVE<br>SUITE 300<br>GARDEN CITY, NY 11530<br>516-557-3544<br>obandoconsulting@gmail.com | FLUSHING SAVINGS BANK, FSB<br>144-51 NORTHERN BLVD<br>FLUSHING, NY 11354 |

### PROPERTY DATA

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| BROOKLYN | 4298 | 44 | Entire Lot | 718 PENNSYLVANIA AVENUE |

Property Type: DWELLING ONLY - 6 FAMILY

### CROSS REFERENCE DATA

CRFN_____ or Document ID_____ or _____ Year____ Reel ____ Page ____ or File Number _____

### PARTIES

| MORTGAGOR/BORROWER: | MORTGAGEE/LENDER: |
|---|---|
| GEOFFREY JAMES<br>116-24 140TH STREET<br>JAMAICA, NY 11436 | FLUSHING SAVINGS BANK, FSB<br>144-51 NORTHERN BLVD<br>FLUSHING, NY 11354 |

### FEES AND TAXES

| Mortgage | | Filing Fee: | |
|---|---|---|---|
| Mortgage Amount: | $ 581,250.00 | | $ 0.00 |
| Taxable Mortgage Amount: | $ 581,250.00 | NYC Real Property Transfer Tax: | |
| Exemption: | | | $ 0.00 |
| TAXES: County (Basic): | $ 2,906.00 | NYS Real Estate Transfer Tax: | |
| City (Additional): | $ 6,538.50 | | $ 0.00 |
| Spec (Additional): | $ 1,453.00 | | |
| TASF: | $ 0.00 | | |
| MTA: | $ 1,743.60 | | |
| NYCTA: | $ 3,632.50 | | |
| Additional MRT: | $ 0.00 | | |
| TOTAL: | $ 16,273.60 | | |
| Recording Fee: | $ 152.00 | | |
| Affidavit Fee: | $ 0.00 | | |

**RECORDED OR FILED IN THE OFFICE OF THE CITY REGISTER OF THE CITY OF NEW YORK**

Recorded/Filed    04-30-2008 08:13
City Register File No.(CRFN):
**2008000172652**

*Annette M Hill*

**City Register Official Signature**

MORTGAGE NO.:
TITLE NO..   REG15453 (COMMONWEALTH LAND TITLE)

PREMISES: 718 PENNSYLVANIA AVENUE
          BROOKLYN NY 11207

District: -
Section: - 14
Block:   - 4298
Lot:     - 44
County: - KINGS

GEOFFREY JAMES

TO

Flushing Savings Bank, FSB

MORTGAGE

RETURN BY MAIL TO:
Flushing Savings Bank, FSB
159-18 Northern Blvd.
Flushing, NY 11358
Attn:Loan Servicing

FL079:290024
APPLICATION NO. 7300

## MORTGAGE

### Between

### Flushing Savings Bank, FSB

### and

### GEOFFREY JAMES

THIS MORTGAGE made this <u>6 day of APRIL, 2007</u>, by and between
<u>GEOFFREY JAMES</u> residing at <u>116-24 140TH STREET JAMAICA NY 11436</u>(the "Mortgagor"), and Flushing Savings Bank, FSB, a corporation organized and existing under and by virtue of the laws of the United States, having an office at 144-51 Northern Blvd., Flushing, NY 11354
(the "Mortgagee").

WITNESSETH, that the mortgagor is indebted to the Mortgagee for the payment of an indebtedness in the sum of <u>FIVE HUNDRED EIGHTY-ONE THOUSAND TWO HUNDRED FIFTY ************* 00/100 DOLLARS</u> (<u>$581,250.00</u>) lawful money of the United States, to be paid, with interest thereon (as such sum may be reduced from time to time, together with the interest thereon, hereinafter sometimes collectively referred to and described as the "Debt"), according to a certain note or obligation bearing even date herewith (the "Note").

NOW THIS INDENTURE WITNESSETH that for better securing the payment of the Debt, and the performance by the Mortgagor of the terms, covenants and conditions contained herein, in the Note and in any other documents and agreements given to secure payment of the Note according to the true intent and meaning thereof, and also for and in consideration of one dollar to the Mortgagor in hand paid by the Mortgagee at or before the sealing and delivery of these presents the receipt whereof is hereby acknowledged, the Mortgagor has mortgaged, granted, bargained, sold, alienated, released, conveyed and confirmed, and by these presents does mortgage, grant, bargain, sell, alien, release, convey and confirm unto the Mortgagee, forever, and grants the Mortgagee a security interest in:

### MORTGAGED PROPERTY

A. All the land located in the County of <u>KINGS</u> and State of <u>NY</u> described in Schedule A annexed hereto and made a part hereof (the "Land"), and known by the street address

<u>718 PENNSYLVANIA AVENUE</u>
<u>BROOKLYN, NY 11207</u>

B. All buildings, structures and improvements of every nature whatsoever now or hereafter situated on the Land (the "Improvements").

C. All fixtures, machinery, appliances, materials, equipment, furniture and personal property of every nature whatsoever now or hereafter owned by the Mortgagor and located in or on, or attached to, or used, or intended to be used, in connection with the operation of, or with construction on, the Land or the Improvements, including all extensions, additions, improvements, betterments, renewals and replacements to any of the foregoing and all of the right, title and interest of the Mortgagor in and to any such personal property or fixtures together with the benefit of any deposits or payments now or hereafter made by the Mortgagor or on its behalf with regard thereto (the "Personal Property").

D. All right, title and interest of the Mortgagor, if any, in and to the land in the bed of the streets or highways abutting the Land to the center line thereof; all easements, rights of way, strips and gores of land, streets, ways, sidewalks, curbs, alleys, passages, sewer rights, waters, water courses, water rights and powers, and all estates, rights, titles, interests, privileges, liberties, tenements, hereditaments, remainders, reversions and appurtenances whatsoever, in any way belonging, relating or appertaining to the Land or the Improvements, or which hereafter shall in any way belong, relate or be appurtenant thereto, whether now owned or hereafter acquired by the Mortgagor (the "Appurtenances").

E. All leases, licenses (including, without limitation, the cash and securities deposited thereunder), rents, issues and profits of the property described above in Paragraphs (A), (B), (C) and (D) (the "Rents") and all the estate, right, title, interest, property, possession, claim and demand whatsoever, at law as well as in equity, of the Mortgagor of, in and to, and all proceeds of any sales or other dispositions of, the property described in Paragraphs (A), (B), (C) and (D) above and this Paragraph (E).

F. All proceeds of and any unearned premiums on any insurance policies covering the Improvements or the Personal Property or the Rents including, without limitation, the right to receive and apply the proceeds of any insurance, judgments or settlements made in lieu thereof.

G. All awards ("Awards"), heretofore made and hereafter to be made by any municipal, state or federal authorities to the Mortgagor and all subsequent owners of the property described above in Paragraphs (A) through (E) including any awards for any changes of grade of streets affecting the property described above in Paragraphs (A) through (E) as the result of the exercise of the power of eminent domain (a "Taking").

H. All the other estate, right, title, interest, use, possession, property, claim and demand whatsoever, contract rights, general intangibles, actions and rights in action, relating to the property described above in Paragraphs (A) through (G) and proceeds, products, replacements, additions, substitutions, renewals and accessions of any of the foregoing.

All the property, interests and rights referred to in Paragraphs (A) through (H) above and any additional property, interests or rights hereafter acquired by the Mortgagor and subject to the lien of this Mortgage or intended to be so are referred to in this Mortgage as the "Mortgaged Property".

TO HAVE AND TO HOLD the Mortgaged Property to the Mortgagee, its successors and assigns, forever.

The Mortgagor hereby grants to the Mortgagee a security interest in all rights and property described above in Paragraphs (A) through Paragraph (H). This Agreement is a self-operative Security Agreement with respect to such rights and property, but the Mortgagor agrees to execute and deliver on demand such other instruments as the Mortgagee may request in order to perfect its security interest or to impose the lien hereof more specifically upon any of such rights and property. The Mortgagee shall have all the rights and remedies under this Mortgage, or under any applicable law or agreements with the Mortgagor, of a Secured Party under the Uniform Commercial Code in addition to those specified herein, including the right to sign the Mortgagor's name to record or continue UCC financing statements required to be periodically filed or renewed.

And the Mortgagor covenants, represents and warrants with the Mortgagee that:

## COVENANTS, REPRESENTATIONS AND WARRANTIES

1. The Mortgagor will pay the Debt as provided in the Note.

2. The Mortgagor, shall (at its expense in so far as is applicable by the context):

(a) maintain the Improvements in good and substantial order and repair and in such fashion that the value and utility of the Mortgaged Property will not be diminished and will make or cause to be made all necessary and appropriate repairs, replacements, and renewals thereof, whether interior or exterior, structural or non-structural. All repairs, replacements and renewals shall be at least in quality and class equal to that of the original Improvements.

(b) not use or cause the whole or any part of the Mortgaged Property to be used in such a manner as to cause the same to be subject to forfeiture under applicable laws. In the event that any person or entity, in possession of the whole or any part of the Mortgaged Property, or otherwise, may, by acts or omissions, cause the Mortgaged Property to be subject to forfeiture, the Mortgagor, within five (5) days after receiving notice of the occurrence of any such act or omission, shall notify the Mortgagee of the occurrence of such act or omission and shall commence such legal proceedings against the party committing or permitting the acts or omissions as shall be necessary to prevent such forfeiture,

(c) comply, or cause to be complied with, with all laws, statutes, codes, acts, ordinances, orders, judgments, decrees, injunctions, rules, regulations, permits, licenses, authorization, directions and requirements of all governments, departments, commissions, boards, courts, authorities, agencies, officials and officers which may, as at the date of this Mortgage or thereafter, affect the Mortgaged Property or any part thereof or its use or condition, or which may affect any adjoining sidewalks, curbs, vaults and vault space if any, or streets or ways in so far as the Mortgagor is required to comply therewith,

(d) comply or cause to be complied with all requirements of the issuer of any policy(s) of insurance covering or affecting the whole or any part of the Mortgaged Property, and all orders, rules, regulations and other requirements of the New York Board of Title Underwriters (or that of any other body exercising similar functions) applicable to the Mortgaged Property or any part thereof,

(e) not do or permit any act or thing which is contrary to the requirements or prohibitions of any document of record affecting the Mortgaged Property nor commit or permit any waste of or any nuisance in, at or on the Mortgaged Property or any part thereof.

3. None of the Improvements or any part or portion thereof, and none of the Personal Property or any part or portion thereof, shall be removed, altered or demolished without the prior written consent of the Mortgagee in each instance, provided, however, that the Mortgagor shall have the right, without the consent of the Mortgagee, to remove and dispose of, free from the lien of this Mortgage, such Personal Property as from time to time may become worn out or obsolete, provided that, simultaneously with or prior to such removal, any such Personal Property shall be replaced with Personal Property of like kind and value at least equal to that of the replaced Personal Property and free from any title retention, security interest or other encumbrance.

4. The Mortgagor will pay when due all liens of any kind, taxes of any kind and nature (including real and personal property taxes and income, franchise, withholding, profits and gross receipts taxes), assessments, water and sewer charges, rents and rates, and other governmental or municipal charges, fines or impositions relating to the Mortgaged Property or any part thereof, or upon the rents, revenues, income or profits of the Mortgaged Property, or arising in respect of the occupancy, use or possession of the whole or any part thereof, and the Mortgagor will promptly deliver official receipts therefore to the Mortgagee.

The Mortgagor will, at the option of Mortgagee, pay to Mortgagee on the first day of each calendar month one-twelfth of an amount (the "Escrow Fund") which would be sufficient to pay the Taxes payable, or estimated by Mortgagee to be payable, during the ensuing twelve (12) months. The Mortgagee's authority to collect and hold and require Mortgagor to make payments on account of the Taxes as provided herein shall include Mortgagee's authority to collect and hold and require Mortgagor to make payments to establish cushions and to repay shortages and deficiencies and for other purposes. Mortgagee will apply the Escrow Fund to the payment of Taxes which are required to be paid by Mortgagor pursuant to the provisions of this Mortgage. If the Escrow Fund is not sufficient to pay the taxes, as the same become payable, Mortgagor shall pay to Mortgagee, upon demand, the amount which mortgagee shall estimate as sufficient to make up the deficiency. Until expended or applied as above provided, any amounts in the Escrow Fund shall constitute additional security for the Debt and shall not bear interest, unless Mortgagee is required by law to pay interest on amounts in the Escrow Fund.

5. The Mortgagor will not claim any deduction from the taxable value of the Mortgaged Property by reason of this Mortgage nor shall the Mortgagor claim or be entitled to any credit against the principal and interest due and owing under the Note and this Mortgage for any taxes, assessments, water rates or other governmental or municipal charges, bonds or impositions paid by the Mortgagor relating to the Mortgaged Property.

6. In the event of the passage after the date of this Mortgage of any law of the state wherein the Mortgaged Property is located deducting from the value of land for the purposes of taxation any lien thereon, or changing in any way the laws for the taxation of mortgages or debts secured by mortgages for state or local purposes, or the manner of the collection of any such taxes so as to affect this Mortgage, or the Debt, the Mortgagee shall have the right to give thirty (30) days written notice to the owner of the Mortgaged Property requiring the payment of the Debt, and if such notice be given, the Debt shall become due, payable and collectible at the expiration of said thirty (30) days. Unless prohibited by applicable law, any notice given pursuant to this Paragraph requiring the payment of the Debt shall provide an option to the Mortgagor, in lieu of such acceleration, to either pay to the Mortgagee an amount or amounts equal to any and all sums payable by the Mortgagee as taxes or otherwise by reason of such laws including taxes, if any, payable on the amounts so paid to the Mortgagee or, in the alternative, pay the Debt in full. If the notice as provided above be given, the payment of said sums described in the preceding sentence or the Debt, as may be the case, shall become due, payable and collectible at the expiration of the thirty (30) day period referred to above.

7.1 If at any time the United States of America, any state thereof or any governmental subdivision of any such state, shall require (i) revenue or other stamps to be affixed to the Note or this Mortgage, or (ii) the payment of any taxes or fees on this Mortgage, or the Note or in connection with the recording of this Mortgage or any amendment, extension or modification hereof, the Mortgagor will pay the same, with interest and penalties thereon, if any. The Mortgagee shall have the right, but not the obligation, to make any such payments on behalf of the Mortgagor. Any such sum paid by the Mortgagee and the interest thereon shall be a lien on the Mortgaged Property prior to any claim, lien, right, title or interest in, to or on the Mortgaged Property attaching or accruing subsequent to the lien of this Mortgage, and shall be deemed to be secured by this Mortgage and evidenced by the Note and shall be paid by the Mortgagor to the Mortgagee, upon demand, together with interest at the Default Rate, as defined herein.

7.2 For the purpose of this Mortgage "Default Rate" means a rate equal to 24.0% per annum, but in no event higher than the maximum rate permitted by the applicable usury law to be charged by this Mortgagee.

8. The Mortgagor represents and warrants that it is the fee simple owner of the Mortgaged Property free of defects, liens, and encumbrances of any nature other than those exceptions to title as set forth in the certificate of title to the Mortgaged Property issued by <u>COMMONWEALTH LAND TITLE #REG15453</u> and redated as at the date of this Mortgage. The Mortgagor warrants that this Mortgage is and will be maintained as a valid first lien on the Mortgaged Property, subject only to the above-mentioned exceptions and will defend the same against the claims of all persons whomsoever. At the Mortgagor's sole cost and expense, the Mortgagor forthwith upon the execution and delivery of this Mortgage, and thereafter from time to time, will cause this Mortgage, and any security instrument creating or evidencing the lien or security interest hereof upon the Mortgaged Property and each instrument of further assurance, to be filed, registered or recorded in such manner and in such places as may be required by any present or future law to publish notice of and fully to protect the lien hereof upon, and the lien of the Mortgagee in, the Mortgaged Property.

9. (a) The Mortgagee shall have the right to appear in and defend any action or proceeding brought with respect to the Mortgaged Property and to bring any action or proceeding, in the name and on behalf of the Mortgagor, which the Mortgagee, in its sole discretion, believes should be brought to protect its interest in or the title to the Mortgaged Property. The Mortgagee may take such action by attorneys selected by the Mortgagee.

(b) If any action or proceeding be commenced, whether adversary or not (including an action to foreclose this Mortgage or to collect the Debt), to which action or proceeding the Mortgagee is made or becomes a party, or in which it becomes necessary to defend, uphold or enforce the lien of this Mortgage, the Mortgagee may prosecute, defend or participate in such action or proceeding by attorneys selected by the Mortgagee.

(c) All sums paid by the Mortgagee for the expense of any such action or proceeding, including foreclosure proceedings, described in this Paragraph (including reasonable counsel fees and expenses) shall be paid by the Mortgagor to the Mortgagee, upon demand, together with the interest thereon at the Default Rate. Any such sum paid by the Mortgagee and the interest thereon shall be a lien on the Mortgaged Property prior to any claim, lien, right, title or interest in, to or on the Mortgaged Property attaching or accruing subsequent to the lien of this Mortgage, and shall be deemed to be secured by this Mortgage and evidenced by the Note.

(d) In any action or proceeding to foreclose this Mortgage, or to recover or collect the Debt, the provisions of law respecting the recovery of costs, disbursements and allowances shall also be applicable.

10. (a) The Mortgagor, until the Debt secured by this Mortgage shall be fully paid and satisfied, shall keep the Improvements and the Personal Property insured, by a company or companies and by a policy or policies, in form and substance, to be approved by the Mortgagee, against:

(i) loss or damage by perils customarily included under standard "all risk" policies, and all other contingencies as may be required by the Mortgagee, in an amount to be approved by the Mortgagee not exceeding in the aggregate one hundred per centum of their full insurable value (the "Required Coverage"), so that the Mortgagor will not be deemed a co-insurer under any such policy.

(ii) if the Mortgaged Property is now located in an area having special flood hazards or if such area hereafter shall be designated by the United States Government, or any agency thereof, as having special flood hazards, a policy insuring against floods in an amount equal to the lesser of (A) the principal amount secured by this Mortgage or (B) the maximum amount available pursuant to federal law;

(iii) insurance against such other hazards (including war damage insurance, if and when the same is available from the United States Government or any agency or subdivision thereof) as may be reasonably required by the Mortgagee from time to time and as are customarily insured against with respect to like properties.

(b)  At the time of the execution of this Mortgage and at least twenty (20) days prior to the expiration of each policy required to be provided by the Mortgagor pursuant to the provisions of this Paragraph, the Mortgagor shall deliver to the Mortgagee the policy or policies or the renewal policy or policies, as the case may be, with appropriate evidence of the payment of the premium therefor.

(c)  The insurance policies required to be procured pursuant to this Mortgage shall:

(i)  as to hazard insurance coverage, contain a standard non-contributory form of mortgagee clause satisfactory to the Mortgagee, naming the Mortgagee, its successors and assigns, as an insured in such capacity, and providing that no act, omission or negligence of the Mortgagor, or its agents, servants or employees, or of any tenant under any lease for the whole or any part of the Mortgaged Property, which might otherwise result in a forfeiture of such insurance or any part thereof, shall in any way affect the validity or enforceability of such insurance insofar as the Mortgagee is concerned,

(ii)  as to all other coverage name the Mortgagor and the Mortgagee, as named insureds, as their respective interests may appear,

(iii)  provide, to the extent obtainable, that such policies may not be cancelled or amended without at least thirty (30) days' prior written notice to the Mortgagee, and

(iv)  include effective waivers by the insurer of all rights of subrogation against the named insured.

(d)  The Mortgagor, at its expense, will furnish to the Mortgagee, within ninety (90) days after demand (but not more frequently than once in each consecutive period of twenty-four (24) calendar months) proof of the then full insurable value of the Improvements and the Personal Property, such proof to be by appraisals satisfactory in form and substance to the Mortgagee and prepared by an appraiser (who may be an appraiser for the insurance company insuring such property) designated and paid for by the Mortgagor and approved by the Mortgagee. No failure or omission on the part of the Mortgagee to request any such appraisals or proof shall relieve the Mortgagor of any of its obligations under this Paragraph.

(e)  Until the full payment of the Debt, the Mortgagee shall have and hold the insurance policies described in this Paragraph as collateral and further security for the payment of the Debt. In default of the Mortgagor's compliance with this Paragraph (i) the Mortgagor hereby agrees to indemnify and hold the Mortgagee harmless against all damage, loss or liability resulting from all risks for which such insurance should have been effected or maintained and (ii) the Mortgagee or its successors or assigns may, but shall have no obligation to, place such insurance as described above, from time to time, in an amount in the aggregate not exceeding the Required Coverage, for the purpose aforesaid, and pay the premium or premiums therefor. In the event of such payment, the Mortgagor will pay to the Mortgagee, its successors or assigns such premium or premiums so paid by the Mortgagee, upon demand, together with the interest thereon at the Default Rate. Any such sum paid by the Mortgagee and the interest thereon shall be a lien on the Mortgaged Property prior to any claim, lien, title or interest in, to or on or claim upon the Mortgaged Property attaching or accruing subsequent to the lien of this Mortgage and shall be deemed to be secured by this Mortgage and evidenced by the Note. In addition, in the event of a default of such payment by the Mortgagor or of the delivery of policies as provided above in this Paragraph, the Debt shall, at the option of the Mortgagee, its successors or assigns, immediately become due and payable.

(f)  Mortgagor hereby grants authority to Mortgagee to endorse all loss drafts in the name of the Mortgagor signing Mortgagor's name for that purpose.  Mortgagor will deliver all loss drafts to Mortgagee within ten (10) days of receipt thereof.  All insurers are authorized to make loss drafts payable to Mortgagee only.  All such proceeds shall be applied at the option of the Mortgagee to any outstanding interest or other moneys due under the Mortgage or to principal which shall be subject to the prepayment clause in all respects or to Mortgagor for expenses actually incurred and paid by Mortgagor in the restoration of the improvements.

(g)  The insurance required pursuant to this Paragraph may be effected by a policy of blanket insurance which may cover property in addition to the Mortgaged Property, provided that the coverage shall be the same as if the Mortgaged Property were the sole property insured and the Mortgagor shall deliver to the Mortgagee a duplicate original copy or copies thereof or original insurance certificates therefor.

(h)  The Mortgagee reserves the right to require the Mortgagor, at any time during the term of this Mortgage, to pay to Mortgagee on the first day of each calendar month one-twelfth of an amount (the "Escrow Fund") which would be sufficient to pay the insurance premiums payable, or estimated by Mortgagee to be payable, during the ensuing twelve (12) months.  The Mortgagee's authority to collect and hold and require Mortgagor to make payments on account of the insurance premiums as provided herein shall include Mortgagee's authority to collect and hold and require Mortgagor to make payments to establish cushions and to repay shortages and deficiencies and for other purposes.  Mortgagee will apply the Escrow Fund to the payment of the Insurance premiums which are required to be paid by Mortgagor pursuant to the provisions of this Mortgage.  If the Escrow Fund is not sufficient to pay the insurance premiums, as the same become payable, Mortgagor shall pay to Mortgagee, upon demand, the amount which Mortgagee shall estimate as sufficient to make up the deficiency.  Until expended or applied as above provided, any amounts in the Escrow Fund shall constitute additional security for the Debt and shall not bear interest, unless Mortgagee is required by law to pay interest on amounts in the Escrow Fund.

11.1  The Mortgagor shall give the Mortgagee prompt notice of any damage or destruction by fire or casualty occurring on the Mortgaged Property, as well as of any condemnation or eminent domain proceedings affecting the same.

11.2  The Mortgagor will not enter into any agreement for a Taking of the Mortgaged Property, or any part thereof, without the prior written consent of the Mortgagee.

12.  In the event the whole or any part of the Mortgaged Property shall be the subject of a Taking, or shall be voluntarily conveyed in lieu thereof prior to the payment in full of the Debt, the Mortgagor shall pay to the Mortgagee, during the period from the date of a Taking or conveyance in lieu thereof, to the payment in full of the Debt, the difference, if any, between the interest payable thereon at the rate stipulated in the Note in respect of the Debt and the interest actually paid to the Mortgagor by the entity exercising the power of eminent domain or to whom the Mortgaged Property was conveyed in lieu of the exercise of such power.

13.1  All Awards are hereby assigned to the Mortgagee. The Mortgagee and its legal representatives, successors and assigns (at its or their option) are hereby irrevocably authorized and empowered to collect and receive the Awards from the authorities making the same, to give proper receipts and acquittances therefor in any of their names or in the name of the Mortgagor, and to apply the same toward the payment of the Debt, the Note or this Mortgage, in such priority and proportions as the Mortgagee in its discretion shall deem proper, although the Debt secured by this Mortgage then may not be due and payable. If the Mortgaged Property is sold, through foreclosure or otherwise, prior to the receipt by the Mortgagee of any Awards, the Mortgagee shall have the right, whether or not a deficiency judgment on the Note shall have been sought, recovered or denied, to receive any Awards, or a portion thereof sufficient to pay the Debt, whichever is less.

13.2 Notwithstanding any Taking, the Mortgagor shall continue to pay the Debt at the time and in the manner provided for in the Note and in this Mortgage and the Debt shall not be reduced until any Awards shall have been actually received and applied by the Mortgagee to the discharge of the Debt. The Mortgagor shall file and prosecute its claim or claims for any Awards in good faith and with due diligence and cause the same to be collected and paid over to the Mortgagee. The Mortgagor, further, hereby irrevocably appoints the Mortgagee and its officers and employees the attorney-in-fact of the Mortgagor, coupled with an interest, to file, prosecute, settle, and compromise its claims for any Awards, to receive any Awards and to endorse any instruments with respect thereto. The Mortgagor further agrees that although it is hereby expressly agreed that the same shall not be necessary in any event, the Mortgagor shall, upon demand, of the Mortgagee, make, execute and deliver to it any and all assignments and other instruments sufficient for the purpose of assigning any Awards to the Mortgagee, free, clear and discharged of any encumbrances of any kind or nature whatsoever.

14. The Mortgagor within six (6) days upon request in person or within fifteen (15) days upon request by mail will furnish a written statement, duly acknowledged, of the amount due on the Debt and this Mortgage and whether any offsets and defenses exist against the Debt.

15.1 The Mortgagor shall furnish to the Mortgagee such financial data or information as the Mortgagee may reasonably request from time to time.

15.2 The Mortgagor will keep adequate records and books of account in accordance with generally accepted accounting principles consistently applied and will permit the Mortgagee, by its agents, accountants and attorneys, to visit and inspect the Premises and examine Mortgagor's records and books of account and to discuss its affairs, finances and accounts with the officers of the Mortgagor, at such reasonable times as may be requested by the Mortgagee.

16. The Mortgagor shall not, without the consent in writing of the Mortgagee, voluntarily sell, transfer, or convey its interest in the Mortgaged Property or any part thereof in or by any one or series of transactions or permit the Mortgaged Property or any part thereof or any interest therein to be sold, transferred, or conveyed. For the purposes of this Paragraph, a "sale" shall include: dissolution, sale of stock and/or sale of assets of the Mortgagor, conveyance or sale by the present ownership to any other persons or parties resulting in a material change in the identity or control of the present shareholders, officers and/or directors of the Mortgagor or conversion to a form different than the legal entity or equitable ownership of the Mortgaged Property without the consent of the Mortgagee.  Consent to one such transaction shall not be deemed to be a waiver of the right to require such consent to further or successive transactions.

17. The Mortgagor shall not, without first obtaining the prior written consent of the Mortgagee in each such instance:

(a) mortgage, convey or grant a lien subordinate to this Mortgage on the Mortgaged Property, or on any or all of the Land, Improvements, Personal Property or Appurtenances of which it is comprised; or

(b) grant a security interest subordinate to the lien and security interest of this Mortgage on the Mortgaged Property; or

(c) assign the rents of the Mortgaged Property.

Consent to one such transaction shall not be deemed to be a waiver of the right to require such consent to future or successive transactions.

18. The Mortgagor shall discharge of record, by the filing of a bond pursuant to court order or otherwise, any mechanic's or materialmen's lien or a judgment lien filed against the Mortgaged Property, within thirty (30) days after the filing thereof.

19. The Mortgagor shall not execute or file or record any instrument which imposes a restriction upon the sale or occupancy of the Mortgaged Property on the basis of race, sex, religion, national origin, color or creed. Upon any violation of this undertaking, the Mortgagee may, at its option, declare the unpaid balance of the Debt to be immediately due and payable.

20. The Mortgagor will, if other than a natural person, do all things necessary to preserve and keep in full force and effect its existence, franchises, rights and privileges as a business or stock corporation, partnership, trust or other entity under the laws of the jurisdiction of its formation or incorporation and will comply with all regulations, rules, ordinances, laws, statutes, orders and decrees of any governmental authority applicable to it or to the Mortgaged Property, or any part thereof. If the Mortgagor herein is a corporation, then the Mortgagor represents that the execution of this Mortgage has been duly authorized by the Board of Directors of the Mortgagor and this Mortgage is made in the regular and ordinary course of business. If the Mortgagor herein is a partnership or joint venture, then the Mortgagor represents that all of its general partners, and, to the extent required by law and its organizational documents, its limited partners, if any, have authorized the execution of this Mortgage and this Mortgage is made in the regular and ordinary course of business.

21. Nothing herein or in the Note, and none of the terms, covenants or conditions hereof or thereof shall impose or shall be deemed to impose upon the Mortgagor an obligation to make any payment, pay any interest or late charges in excess of, or do any act or take any action, or forbear from doing any act or taking any action, in violation of any statute, rule, ordinance or regulation in effect and effective as of the date of such payment, act, action or forbearance. In no event shall the Mortgagor be required to make any such illegal or impermissible payment or to take or do any such illegal or impermissible act or forbear from so doing or so taking nor shall any such failure so to pay or act or such forbearance be deemed a default hereunder. If the provisions of this Mortgage would at any time otherwise require payment by the Mortgagor to the Mortgagee of an amount of interest in excess of the maximum amount then permitted by law, the interest payments to the Mortgagee shall be reduced to the extent necessary so that the Mortgagee shall not receive interest in excess of such maximum amount. To the extent that, pursuant to the foregoing sentence, the Mortgagee shall receive interest payments hereunder in an amount less than the amount otherwise provided, such deficit (the "Interest Deficit") will accumulate and will be carried forward (without interest) until the Debt is paid in full. Interest otherwise payable to the Mortgagee hereunder for any subsequent period shall be increased by the maximum amount of the Interest Deficit that may be so added without causing the Mortgagee to receive interest in excess of the maximum amount then permitted by law. The terms, covenants and conditions hereof or of the Note requiring any such illegal or impermissible payment, act, action or forbearance on the part of the Mortgagor to be made or taken are deemed amended, modified or altered in such a manner as to bring all and each of them into conformity with the applicable statutes, rules, ordinances or regulations in respect of the Mortgagor and the Mortgagor hereby covenants and agrees to abide by, conform to and comply with any and all such terms, covenants and conditions as so amended, modified or altered.

22. In addition to the Note, this Mortgage is intended to secure and provide for the payment and performance of any and all obligations now due and owing or which may hereafter be or become due or owing by the Mortgagor to the Mortgagee, however the maximum amount secured by this Mortgage at execution or which under any contingency may be secured hereby at any time in the future shall not exceed in the aggregate (i) the stated principal amount of this Mortgage (ii) interest, and (iii) all other amounts advanced by the Mortgagee and secured by this Mortgage in accordance with the terms hereof for the protection of the Mortgaged Property or the preservation of the lien of this Mortgage or both. The obligation of the Mortgagee to make further or future advances or re-advances shall be optional with the Mortgagee. Advances and re-advances may be made under the provisions hereof, or otherwise, to the present or any future owner of the Mortgaged Property.

23. Pursuant to Section 291-f of the Real Property Law of the State of New York, neither the Mortgagor nor any tenant of the Mortgaged Property or the Improvements or any part of either shall have the right or power, as against the Mortgagee without its consent, to cancel, abridge or otherwise modify tenancies, subtenancies, leases or subleases now or hereafter in effect in respect of all or any part of the Mortgaged Property or the Improvements or to accept or make, as the case may be, prepayments of installments of rent to become due thereunder. The Rents of the Mortgaged Property are hereby transferred and assigned to the Mortgagee as further security for the payment of the Debt, and the Mortgagee shall have the right to enter upon the Mortgaged Property for the purpose of collecting the same and to let and operate the Mortgaged Property or any part thereof and to apply the Rents, issues and profits, either in whole or in part, as the Mortgagee elects, to the payment of all charges and expenses of the Mortgaged Property or in reduction of any part of the Debt or other sums due or to become due under the Note or this Mortgage. This assignment and grant shall continue in effect until the Debt and all other obligations secured by this Mortgage are paid. The Mortgagee hereby waives the right to enter upon the Mortgaged Property for the purpose of collecting the Rents and the Mortgagor shall have a license to collect and receive the Rents until default hereunder, but such license of the Mortgagor may be revoked by the Mortgagee upon any such default. The Mortgagee may apply all Rents or any part thereof so received hereunder, after the payment of all of its expenses including costs and attorneys' fees, to the Debt in such manner as it elects or at its option the entire amount or any part thereof so received may be released to the Mortgagor.

24. Nothing herein contained shall be construed as depriving the Mortgagee of any right or advantage available under Section 254 or 271 of the Real Property Law of the State of New York or any other similar, applicable law of the state in which the Mortgaged Property is located, but all covenants herein differing therefrom shall be construed as conferring additional and not substitute rights and advantages, except that the provisions of this Mortgage shall supersede the provisions of subdivision 4 of said Section 254.

25. The Mortgagee and its agents shall have the right to enter and inspect the Mortgaged Property at all reasonable times upon reasonable notice.

26. This Mortgage may not be changed or modified orally, but only by an agreement in writing and signed by the party against whom enforcement of any waiver, change, modification or discharge is sought. THE MORTGAGOR ACKNOWLEDGES DELIVERY TO IT, WITHOUT CHARGE THEREFOR, OF A COPY HEREOF AND OF THE NOTE.

27. This Mortgage may be executed in any number of duplicate originals and each such duplicate original shall be deemed to constitute but one and the same instrument.

28. If any term, covenant or condition of this Mortgage shall be held to be invalid, illegal or unenforceable in any respect, this Mortgage shall be construed without such provision.

29. If the Mortgagor consists of more than one person or entity, the obligations and liabilities of each such person or entity hereunder shall be joint and several. The relative words herein of single or plural number, or masculine or feminine or neuter gender shall be read as if written in the single or plural, or in the male, neuter or female gender, as the context and as the case may be.

30. The covenants, agreements and options herein contained shall bind and inure to the benefit of the heirs, distributees, executors, administrators, successors and assigns of the parties hereto but the foregoing provisions of this Paragraph shall not constitute a waiver of the provisions of Paragraphs 16 and 17 above.

31. If the Mortgagor shall well and truly pay to the Mortgagee the Debt at the time and in the manner provided in the Note and this Mortgage and shall well and truly abide by and comply with each and every covenant and condition set forth in this Mortgage and in the Note, then these presents and the estate hereby granted shall cease, determine and be void.

## **DEFAULTS**

32.  The Debt shall become due, at the option of the Mortgagee, upon the occurrence of any of the following events:

    (a)  after default in the payment of any installment of principal or interest as provided in the Note,

    (b)  after default in payment and reimbursement of the Mortgagee, after demand, for any costs, expenses, and fees advanced or incurred by the Mortgagee in curing any default or failure of the Mortgagor under this Mortgage,

    (c)  if any warranty, representation or certification made herein or in any financial statement furnished pursuant hereto or in connection with the loan evidenced by the Note shall be materially false,

    (d)  after default in keeping the Mortgaged Property insured as herein provided,

    (e)  after default after notice and demand either in assigning and delivering the policies insuring the Improvements or the Personal Property against loss as hereinafter provided for or in reimbursing the Mortgagee for premiums paid on such insurance, as hereinabove provided for,

    (f)  after default upon request in furnishing a statement of the amount due on this Mortgage and whether any offsets or defenses exist against the Debt, as hereinabove provided for,

    (g)  upon the actual or threatened alteration, demolition or removal of any of the Improvements erected or to be erected upon the Mortgaged Property or of the Personal Property,

    (h)  if the Mortgagor does or permits to be done anything that may in any way impair the lien of this Mortgage or impair the value of the Mortgaged Property or any of the Improvements or weaken or diminish the security intended to be given under and by virtue of this Mortgage, or

    (i)  upon the failure of the Mortgagor to perform or comply with any other covenant, agreement or condition of this Mortgage, the Note or any other agreement between the Mortgagor and the Mortgagee in accordance with the terms hereof and thereof.

33.  The Debt shall also become due, at the option of the Mortgagee, upon the occurrence of any of the following events:

    (a)  after default, for thirty (30) days, in the payment of any taxes of any kind and nature, assessments, water and sewer charges, rents and rates, and other governmental or municipal charges, fines or impositions relating to the Mortgaged Property or any part thereof,

    (b)  after failure for thirty (30) days to exhibit to the Mortgagee receipted bills for any tax, water rate or assessment herein referred to, or

    (c)  if the Mortgagee shall give the written notice specified above in Paragraph 6.

34.  The Debt shall, forthwith, become due upon the occurrence of any of the following events; the Mortgagor or any guarantor of the payment of the Note and/or of this Mortgage shall:

(a) call a meeting of or make an assignment for the benefit of creditors,

(b) file a petition in bankruptcy, or be adjudicated insolvent    or bankrupt,

(c) suffer an order for relief under any federal bankruptcy law, or petition or apply to any tribunal for the appointment of a receiver or a trustee for it or a substantial part of its assets,

(d) commence any proceedings under any bankruptcy, reorganization, arrangement, readjustment of debt, dissolution or liquidation law or statute of any jurisdiction, whether now or hereafter in effect,

(e) have filed against it a petition, application or proceeding described above in subdivision (d) or such a petition, application or proceeding shall have been commenced against it, which remains undismissed or unstayed for a period of thirty (30) days or more,

(f) by any act or omission indicate its consent to, approval of or acquiescence in any petition, application or proceeding described above in subdivision (d) or in the appointment of a custodian, receiver or any trustee for it or any substantial part of any of its property,

(g) suffer any such custodianship, receivership or trusteeship to continue undischarged for a period of thirty (30) days or more,

(h) conceal, remove or permit to be concealed or removed, any part of its property, with intent to hinder, delay or defraud its creditors or any of them,

(i) make or suffer a transfer of any of its property which may be fraudulent under any bankruptcy, fraudulent conveyance or similar law,

(j) make any transfer of its property to or for the benefit of a creditor at a time when other creditors similarly situated have not been paid,

(k) shall suffer or permit, while insolvent, any creditor to obtain a lien upon any of its property through legal proceedings or distraint which is not vacated within thirty (30) days from the date thereof, or

(l) generally not pay its debts as such debts become due.

35. Upon the occurrence of any default hereunder, the Note and all other sums secured hereby shall bear interest at the Default Rate.

36. Any check, draft, money order or other instrument given in payment of all or any portion of the Note or pursuant to this Mortgage may be accepted by the Mortgagee and handled in collection in the customary manner, but the same shall not constitute payment hereunder or diminish any rights of the Mortgagee, except to the extent that actual cash proceeds of such instrument are unconditionally received by the Mortgagee and applied as the case may be to the Debt in the manner provided in the Note or to the sum due under this Mortgage.

37. In the event that any payment shall become overdue for a period in excess of 15 days, a "late charge" of eight cents ($.08), or such lesser amount as may be permitted by law in respect of the Mortgagor, for each dollar so overdue may be charged by the Mortgagee for the purpose of defraying the expenses incident to handling such delinquent payment. In the event the Mortgagor defaults as set forth in this Mortgage, there will be a default reinstatement fee of one (1%) percent of the then principal balance outstanding.

## REMEDIES

38.  The Mortgagee, in any action to foreclose this Mortgage, shall be entitled to the appointment of a receiver, without regard to the solvency or insolvency of any person or entity obligated for the payment of the Debt or the adequacy of any security for the Debt and without notice, and notice of such appointment is hereby expressly waived. The Mortgagee or any receiver shall be entitled to take possession of the Mortgaged Property from the owner, tenants and/or occupants of the whole or any part thereof and to collect and receive the Rents and the value of the use and occupation of the Mortgaged Property, or any part thereof, from the then owner, tenants and/or occupants thereof for the benefit of the Mortgagee. The Mortgagor will pay monthly in advance to the Mortgagee or to any receiver appointed to collect the Rents the fair and reasonable rental value for the use and occupation of the Mortgaged Property, or of such part thereof as may be in the possession of the Mortgagor, and upon default in any such payment the Mortgagor will vacate and surrender the possession of the Mortgaged Property to the Mortgagee or such receiver.

39.  In case of a sale in foreclosure, the Mortgaged Property, or so much thereof as may be affected by this Mortgage, may be sold in one or more parcels or interests and in such order as the Mortgagee shall determine in its sole discretion. The Mortgagor waives and releases any right to have the Mortgaged Property marshalled.

40.  In the event of a foreclosure of this Mortgage or the succession by the Mortgagee to the interests of the Mortgagor hereunder, the purchaser of the Mortgaged Property or such successor shall succeed to all rights of the Mortgagor, including any right to proceeds of insurance and to unearned premiums, and in and to all policies or certificates of insurance assigned and delivered to the Mortgagee pursuant to this Mortgage.

41.  If the Mortgagor shall fail to perform or comply with any covenant, representation, warranty, agreement or condition of this Mortgage, the Mortgagee shall have the right, but not the obligation, to perform and comply with any such covenant, representation, warranty, agreement or condition. The cost thereof paid by the Mortgagee together with all costs, expenses and disbursements shall be paid by the Mortgagor to the Mortgagee, upon demand, together with the interest thereon at the Default Rate. Any such sum paid by the Mortgagee and the interest thereon shall be a lien on the Mortgaged Property prior to any claim, lien, right, title or interest in, to or on the Mortgaged Property attaching or accruing subsequent to the lien of this Mortgage, and shall be deemed to be secured by this Mortgage and evidenced by the Note.

42.  The Mortgagee may be the purchaser of the whole or any part of the Mortgaged Property or of any interest therein at any sale of the Mortgaged Property whether pursuant to foreclosure or power of sale or otherwise hereunder and may apply upon the purchase price any sum the payment of which is secured by this Mortgage. The Mortgagee, upon any such purchase, shall acquire good title to the properties so purchased free of the lien of this Mortgage and free of all equities and rights of redemption in the Mortgagor.

43.  The obligation of this Mortgage and of the Note shall continue until the Debt is paid in full notwithstanding any action or actions or partial foreclosure which may be brought to recover any amount or amounts for installments of principal, interest, taxes, assessments, water rates or insurance premiums or other sums or charges due and payable under the provisions of this Mortgage.

44.  The Mortgagor hereby waives the right to a trial by jury, the right to claim any offset and to assert a counterclaim in any action or proceeding in which the Mortgagor and the Mortgagee are parties brought by the Mortgagee to enforce its rights hereunder.

45. Any assignee of this Mortgage and the Note shall take the same free and clear of all offsets, counterclaims and defenses of any nature whatsoever which the Mortgagor may have against any assignor of this Mortgage and the Note and no such offset, counterclaim or defense shall be interposed or asserted by the Mortgagor in any action or proceeding brought by any such assignee upon this Mortgage and/or the Note and any such right to interpose or assert any such offset, counterclaim or defense in any such action or proceeding is hereby expressly waived by the Mortgagor.

46. The Mortgagor shall not be relieved of the Mortgagor's obligation to pay the Debt at the time and in the manner provided for in the Note and this Mortgage by reason of (i) failure of the Mortgagee to comply with any request of the Mortgagor or any guarantor of the payment of the Note and/or of this Mortgage to take any action to foreclose this Mortgage or otherwise enforce any of the provisions hereof or of the Note or of any other mortgage, instrument or document evidencing, securing or guaranteeing payment of the Debt or any portion thereof, (ii) the release, regardless of consideration, of the whole or any part of the Mortgaged Property or any other security for the Debt or the release of any individual or entity guaranteeing the payment of the Note and/or of this Mortgage, or (iii) the extension or modification of this Mortgage or any other mortgage, instrument or document evidencing, securing or guaranteeing payment of the Note and/or of this Mortgage or any portion thereof, without first having obtained the consent of the Mortgagor, and in the last event, the Mortgagor shall continue to be obligated to pay the Debt at the time and in the manner provided in the Note and this Mortgage, as so extended or modified, unless expressly released and discharged by the Mortgagee. Regardless of consideration, and without the necessity for any notice to or consent by the holder of any subordinate lien, encumbrance, right, title or interest in or to the Mortgaged Property, the Mortgagee may release any person at any time liable for the payment of the Debt or any portion thereof or any individual or entity guaranteeing the payment of the Note and/or of this Mortgage or any part of the security held for the Debt or with respect to any guarantee, and may extend the time of payment or otherwise modify the terms of the Note and/or this Mortgage, including, without limitation, a modification of the interest rate payable on the principal balance of the Note, without in any manner impairing or affecting this Mortgage or the lien thereof or the priority of this Mortgage, as so extended and modified, as security for the Debt over any such subordinate lien, encumbrance, right, title and interest. The Mortgagee may resort for the payment of the Debt to any other security or guarantee held by the Mortgagee in such order and manner as the Mortgagee, in its discretion, may elect. The Mortgagee shall not be limited exclusively to the rights and remedies herein stated but shall be entitled to every additional right and remedy now or hereafter afforded by law or equity.

47. The Mortgagee shall have the right from time to time to take action to recover any sum or sums which constitute a part of the Debt as the same become due, without regard to whether or not the balance of the Debt shall be due, and without prejudice to the right to the Mortgagee thereafter to bring an action of foreclosure, or any other action, for a default or defaults by the Mortgagor existing at the time such earlier action was commenced.

48. All remedies provided in this Mortgage are distinct from and cumulative to any other right or remedy under this Mortgage, the Note, the Loan Agreement, any guarantee of the payment of the Note and/or of this Mortgage or any other agreement, among others, if any, the Mortgagor and the Mortgagee executed simultaneously or in connection herewith, or afforded by law or equity, and may be exercised concurrently, independently or successively. Wherever in this Mortgage the prior consent of the Mortgagee is required, the consent of the Mortgagee given as to one such transaction shall not be deemed to be a waiver of the right to require such consent to future or successive transactions. Any such consents shall be in writing.

49. Any forbearance by the Mortgagee in exercising any right or remedy hereunder, or otherwise afforded by applicable law, shall not be a waiver of or preclude the exercise of any such right or remedy. The procurement of insurance or the payment of taxes or other liens or charges by the Mortgagee or other corrective or security protecting measures by the Mortgagee shall not be a waiver of the Mortgagee's right to accelerate the maturity of the Debt.

## SPECIAL PROVISIONS

50. (a) The Mortgagor acknowledges that, in the event of foreclosure of the Mortgaged Property, the Mortgagee may be required to comply with Article 31-B, New York State Tax Law, also known as the Real Property Gains Tax Law, as it may be amended from time to time (the "Statute"). To enable the Mortgagee to comply with the Statute, if required, the Mortgagor hereby agrees to assist and cooperate with the Mortgagee by furnishing or executing, acknowledging, if required, and delivering such documents, instruments, agreements, forms, schedules and information as the Mortgagee may reasonably request in connection therewith, to the extent the same is available to the Mortgagor, and the Mortgagor agrees to pay the tax that may be due under the Statute.

(b) Without limiting the generality of the foregoing, the Mortgagor shall:

(i) maintain information, documents and records of all capital improvements made to the Mortgaged Property in sufficient detail to comply with the requirements of the Statute.

(ii) upon demand of the Mortgagee, deliver copies to the Mortgagee of and make available for inspection and examination at any time upon demand by the Mortgagee or its duly authorized agent or employee, all such information, documents and records kept in accordance with the Statute or required by the Mortgagee to enable it to comply therewith. Such records shall be kept by the Mortgagor for the duration of this Mortgage.

(iii) in the event of a foreclosure of the Mortgaged Property, prepare, submit, affirm and file with the applicable authority, all forms, returns and documents required of a transferor and undertake all appropriate measures and procedures to comply with the Statute.

(iv) in the event of a foreclosure of the Mortgaged Property, pay the tax determined by the applicable authority to be due. If the Mortgagor fails to perform or comply with the Statute or this Paragraph or fails to pay the tax required by the Statute, the Mortgagee may, but without any obligation to do so and without notice to or demand on the Mortgagor and without releasing the Mortgagor from any obligation, so perform or comply or pay any and all taxes owing under the Statute in such manner and to such extent as the Mortgagee may deem necessary to protect the security of, or to enable it to foreclose the lien of, this Mortgage. All such costs paid by the Mortgagee and the interest thereon at the Default Rate shall be a lien on the Mortgaged Property prior to any claim, lien, title or interest in, to or on or claim upon the Mortgaged Property attaching or accruing subsequent to the lien of this Mortgage and shall be deemed to be secured by this Mortgage and evidenced by the Note.

(c) In connection with a foreclosure of the Mortgaged Property, the amount of such tax (and any interest, penalty, fine or other related charges imposed in connection therewith) shall be allowed to the Mortgagee out of the proceeds of any sale or conveyance; and treated as a cost and expense of foreclosure to which the proceeds thereof (or of any of the other aforesaid transactions) shall first be applied.

(d) The Mortgagor hereby assumes complete liability for any costs, penalties, expenses and fees assessed against or paid by the Mortgagee, including reasonable attorneys', accountant's, architect's, and other professionals' or experts' fees and disbursements, which are associated with the performance, payment or compliance with the Statute, and for any costs, penalties and fees assessed as a consequence of a violation by the Mortgagor of this Paragraph.

(e) The Mortgagor also acknowledges and agrees that this Paragraph may be specifically enforced and that the rights of the Mortgagee set forth in this Paragraph are not exclusive and are without limitation of any other rights and remedies to which the Mortgagee shall be entitled pursuant to law or equity.

51. The Mortgaged Property is not improved nor is to be improved by one or more structures containing, in the aggregate, not more than six residential units, each unit with separate cooking facilities.

52. In compliance with Section 13 of the New York State Lien Law, the Mortgagor will receive the advances secured by this Mortgage and will hold the right to receive such advances as a trust fund to be applied first for the purpose of paying the cost of improvement (as defined in Section 2 of the Lien Law of the State of New York, whether or not the Mortgaged Property is located in that State), and the Mortgagor will apply the same first to the payment of the cost of improvement before using any part of the total of the same for any other purpose.

53. All notices or other communications required to be given pursuant to this Mortgage shall be in writing and be deemed given on the second business day of the Mortgagee next following the deposit of such written notice or communication enclosed in a prepaid wrapper, certified mail, return receipt requested, in a post office or official depository under the care and custody of the United States Postal Service, addressed as follows:

If to the Mortgagor:   GEOFFREY JAMES
        116-24 140TH STREET
        JAMAICA, NY 11436

If to the Mortgagee:   Flushing Savings Bank, FSB
        144-51 Northern Blvd.
        Flushing, NY 11354

Any party may change the person or address to whom or which notices are to be given hereunder, by notice duly given hereunder; provided, however, that any such notice shall be deemed to have been given hereunder only when actually received by the party to which it is addressed.

54. Intentionally omitted prior to execution.

55. Intentionally omitted prior to execution.

56. If the Mortgagor shall request the Mortgagee's consent or approval pursuant to any of the provisions of this Mortgage or otherwise, and the Mortgagee shall fail or refuse to give, or shall delay in giving, such consent or approval, the Mortgagor shall in no event make, or be entitled to make, any claim for damages (nor shall the Mortgagor assert, or be entitled to assert, any such claim by way of defense, set-off, or counterclaim) based upon any claim or assertion by the Mortgagor that the Mortgagee unreasonably withheld or delayed its consent or approval, and the Mortgagor hereby waives any and all rights that it may have, from whatever source derived, to make or assert any such claim. The Mortgagor's sole remedy for any such failure, refusal, or delay shall be an action for a declaratory judgment, specific performance, or injunction, and such remedies shall be available only in those instances where the Mortgagee has expressly agreed in writing not to unreasonably withhold or delay its consent or approval or where, as a matter of law, the Mortgagee may not unreasonably withhold or delay the same.

57. (a) For purposes of this Mortgage, the following terms shall have the following meanings:

"Hazardous Materials" - shall mean existing and future asbestos, urea formaldehyde foam insulation, polychlorinated bithenyls or related or similar materials, petroleum products, explosives, radioactive materials, or any other hazardous or toxic or harmful materials, wastes and substances or any other chemical, material, substance or element which are defined, determined, identified, prohibited, limited or regulated by the Environmental Laws, or any other chemical, material, substance or element which is known to be harmful to the health or safety of occupants of property or which are defined as a hazardous or toxic substance by any federal, state, or local law, ordinance, rule or regulation, including, but not limited to the Federal Water Pollution Control Act (33 U.S.C. (1251 et seq.), the Clean Air Act (42 U.S.C. (7401 et seq.), the Resource Conservation and

Recovery Act (42 U.S.C. (6901 et seq.), the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (42 U.S.C. (9601 et seq.), the Hazardous Materials Transportation Act (49 U.S.C. (1801 et seq.), and/or the regulations promulgated in relation thereto, all as the same may be amended from time to time (collectively, the "Federal Statutes"), the New York State Environmental Conservation Law Article 27, Title 13, (the "State Statute"), and the regulations promulgated in relation thereto, all as the same may be amended from time to time.

"Environmental Laws" - shall mean any applicable federal, state or local laws, rules, regulation, resolutions, ordinances, directives or orders (whether now existing or hereafter enacted or promulgated) or any judicial or administrative interpretation of such laws, rules, regulations, resolutions, ordinances, directives or orders or any other applicable determination regarding land, water, air, health, safety or environment, including for example but not limited to, the Federal Statutes and the State Statute.

"Governmental Authority" - shall mean any federal, state, or local government, governing body, agency, court, tribunal, authority, subdivision, bureau or other recognized body having jurisdiction to enact, promulgate, interpret, enforce, review or repeal any Environmental Law.

"Environmental Complaint" - shall mean any judgment, lien, order, complaint, notice, citation, action, Proceeding or investigation pending before any Governmental Authority, including, without limitation, any environmental regulatory body, with respect to or threatened against or affecting the Mortgagor or relating to its business, assets, property or facilities or the Mortgaged Property, in connection with any Hazardous Material or any Hazardous Discharge or any Environmental Law.

"Hazardous Discharge" - shall mean any release of a Hazardous Material caused by the seeping, spilling, leaking, pumping, pouring, emitting, using, emptying, discharging, injecting, escaping, leaching, dumping or disposing of any Hazardous Material into the environment, and any liability for the costs of any cleanup or other remedial action.

(b) The Mortgagor covenants, represents and warrants that:

(i) to the best of the Mortgagor's knowledge, after due inquiry and investigation, none of the real property owned or occupied by the Mortgagor and located in the state in which the Mortgaged Property is situated, including, but not limited to the Mortgaged Property, has ever been used by previous owners, operators or occupants or the Mortgagor to generate, manufacture, refine, transport, treat, store, handle or dispose, transfer, produce, process or in any manner deal with any Hazardous Material,

(ii) the Mortgagor has not received a summons, citation, directive, letter or other communication, written or oral, from any Government Authority concerning any intentional or unintentional action or omission on the Mortgagor's part which had resulted in the violation of any Environmental Laws, as the same may relate to the Mortgaged Property,

(iii) to the best of the Mortgagor's knowledge, after due inquiry and investigation, no lien has been attached to any revenues or any real or personal property owned by the Mortgagor and located in the state where the Mortgaged Property is located, including, but not limited to the Mortgaged Property, for "Damages" and/or "Cleanup and Removal Costs", as such terms are defined in any Environmental Law, or arising from an intentional or unintentional act or omission in violation thereof by the Mortgagor or by any previous owner and/or operator of such real or personal property, including, but not limited to the Mortgaged Property,

(iv) the Mortgagor has duly complied, and shall continue to comply, with the provisions of the Environmental Laws governing it, its business, assets, property, facilities and the Mortgaged Property, and shall keep the Mortgaged Property free and clear of any liens imposed pursuant to such laws,

(v) the Mortgagor shall not, and shall not permit any of its officers, partners, employees, agents, contractors, licensees, tenants, occupants or others to generate, manufacture, refine, transport, treat, store, handle, dispose, transfer, produce, process or in any manner deal with any Hazardous Material on the Mortgaged Property,

(vi) there is not now outstanding any Environmental Complaint issued by any Governmental Authority to the Mortgagor or relating to the Mortgagor's business, assets, property, and facilities or the Mortgaged Property under any Environmental Law, and there is not now existing any condition which, if known by the proper authorities, could result in any Environmental Complaint, and that

(vii) the Mortgagor has, and will continue to have, all necessary licenses, certificates and permits under the Environmental Laws relating to the Mortgagor and its facilities, property, assets, and business, and the Mortgaged Property and the foregoing are in compliance with all Environmental Laws.

(c) If the Mortgagor receives any notice of (i) the presence of Hazardous Materials on the Mortgaged Property, (ii) any violation of or noncompliance with any Environmental Law, (iii) the occurrence of a Hazardous Discharge on or about any asset, business, facility or property of the Mortgagor or caused by the Mortgagor, or (iv) any Environmental Complaint affecting the Mortgagor or the Mortgaged Property or the Mortgagor's operations, assets, business, facilities or properties, then the Mortgagor will give written notice of the foregoing to the Mortgagee within ten (10) days of receipt thereof and shall (1) promptly comply with the Environmental Laws and all other laws, regulations, resolutions and ordinances to correct, contain, cleanup, remove, resolve or minimize the impact of such Hazardous Materials, Environmental Discharge or Environmental Complaint and (2) shall (i) post a bond from a surety or (ii) a letter of credit issued by a lending institution, with the Mortgagee, the surety or the lending institution, and the form, substance and amount of the bond or letter of credit to be reasonably satisfactory to the Mortgagee and the applicable Governmental Authority, or shall give to the Mortgagee and the applicable Governmental Authority such other security satisfactory in form, substance and amount to both the Mortgagee and the applicable Governmental Authority to assure that the Mortgagor does correct, contain, cleanup, remove, resolve or minimize the impact of such Hazardous Materials, Environmental Discharge or Environmental Complaint.

(d) Without limitation of the Mortgagee's rights under this Mortgage or applicable law, the Mortgagee shall have the right, but not the obligation, to exercise any of its rights to cure as provided in this Mortgage or to enter onto the Mortgaged Property or to take such other actions as it deems necessary or advisable to correct, contain, cleanup, remove, resolve or minimize the impact of, or otherwise deal with, any such Hazardous Material, Hazardous Discharge or Environmental Complaint upon its receipt of any notice from any person or entity or Governmental Authority, informing the Mortgagee of such Hazardous Material, Hazardous Discharge or Environmental Complaint, which if true, could adversely affect the Mortgagor or any part of the Mortgaged Property or which, in the sole opinion of the Mortgagee, could adversely affect its collateral security under this Mortgage. All reasonable costs and expenses incurred and paid by the Mortgagee in the exercise of any such rights shall be paid by the Mortgagor to the Mortgagee upon demand together with the interest thereon at the Default Rate of interest. Any such sum paid by the Mortgagee and the interest thereon shall be a lien on the Mortgaged Property prior to any claim, lien, right, title or interest in, to or on the Mortgaged Property attaching or accruing subsequent to the lien of this Mortgage, and shall be deemed to be secured by this Mortgage and evidenced by the Note.

(e) Upon written request, the Mortgagor shall provide to the Mortgagee the following information pertaining to all operations conducted in or on the Mortgaged Property:

(i) copies of all licenses, certificates and permits under the Environmental Laws;

(ii) material safety data sheets and maps, diagrams and site plans showing the location of all storage areas and storage tanks for all Hazardous Materials or other chemicals in, use at, manufactured at, brought to or stored at the Mortgaged Property;

(iii) copies of all materials filed with any Governmental Authority;

(iv) a description of the operations and processes of the Mortgagor; and

(v) any other information which the Mortgagee may reasonably require.

(f) Upon reasonable notice to the Mortgagor, the Mortgagee, its officers, employees, agents and contractors, may enter the Mortgaged Property to inspect it and to conduct, complete and take such tests, samples, analyses and other processes as the Mortgagee shall require to determine the Mortgagor's compliance with this Paragraph and the Environmental Laws. The costs, expenses and fees of the Mortgagee of such entry, inspection, tests, samples, analyses and processes shall be paid and reimbursed by the Mortgagor upon demand by the Mortgagee. Any such sum paid by the Mortgagee and the interest thereon shall be a lien on the Mortgaged Property prior to any claim, lien, right, title or interest in, to or on the Mortgaged Property attaching or accruing subsequent to the lien of this Mortgage, and shall be deemed to be secured by this Mortgage and evidenced by the Note.

(g) In addition to those events of default previously specified in this Mortgage, the occurrence of any of the following events shall constitute a default under this Mortgage, entitling the Mortgagee to all rights and remedies provided therefor:

(i) if the Mortgagor shall fail to comply with any provision of this Paragraph; or

(ii) if any Governmental Authority asserts or creates a lien upon any or all of the Mortgaged Property by reason of the presence of Hazardous Materials or the occurrence of a Hazardous Discharge or Environmental Complaint or otherwise, and the Mortgagor does not, within the earlier of thirty (30) days after the recording thereof or prior to the institution by such Governmental Authority of any steps to foreclose such lien, cause such lien to be discharged of record.

(iii) if any Governmental Authority asserts a claim against the Mortgagor, the Mortgaged Property or the Mortgagee for damages or cleanup or remedial costs related to any Hazardous Materials or any Hazardous Discharge or any Environmental Complaint; provided, however, such claim shall not constitute a default if, within five (5) business days of the Mortgagor's receipt of notice of the foregoing:

(1) the Mortgagor can prove to the Mortgagee's reasonable satisfaction that the Mortgagor has commenced and is diligently pursuing either: (A) a cure, remedy or correction of the event which constitutes the basis for the claim, and is continuing diligently to pursue such cure or correction to completion, in strict compliance with the Environmental Laws or Environmental Complaint, as applicable, or (B) proceedings for injunction, a restraining order or other appropriate emergency relief prevent such Governmental Authority from asserting such claim, which relief is granted within ten (10) days of the occurrence giving rise to the claim and the injunction, order or emergency relief is not thereafter dissolved or reversed on appeal; and

(2) in either of the foregoing events, the Mortgagor shall (i) give such surety or other security, which may be required by and satisfactory to both the Governmental Authority asserting the claim and to the title company insuring the interest of the Mortgagee under this Mortgage (the "Title Company"), to secure the proper and complete cure or correction of the event which constitutes the basis for the claim or, (ii) at the Mortgagee's request if no such bond or security has been given, the Mortgagor shall post a bond from a surety or a letter of credit issued by a lending institution, with the Mortgagee, the surety or the lending institution, and the form, substance and amount of the bond or letter of credit to be reasonably satisfactory to the Mortgagee and to the Title Company, or shall give to the Mortgagee and the Title Company such other security satisfactory in form, substance and amount to the Mortgagee and to the Title Company, to secure the payment for all of the work, labor and services required to effect a proper and complete cure or correction of the condition which constitutes the basis for the claim.

(h) The Mortgagor covenants and agrees, at its sole cost and expense, to indemnify, protect, and save the Mortgagee harmless against and from any and all damages, losses, liabilities, obligations, penalties, claims, litigation, demands, defenses, judgments, suits, proceedings, costs, disbursements or expenses of any kind or of any nature whatsoever (including, without limitation, reasonable attorneys' and experts' fees and disbursements) which may at any time be imposed upon, incurred by or asserted or awarded against the Mortgagee and arising from or out of:

(i) the Mortgagor's failure to perform and comply with this Paragraph, or

(ii) any Hazardous Material, any Hazardous Discharge, any Environmental Complaint, or any Environmental Law applicable to the Mortgagor, its operations, business, assets, property or facilities, or the Mortgaged Property, or

(iii) any action against the Mortgagor under this indemnity.

58. (a) The Mortgagor hereby consents to the jurisdiction of the courts of the State of New York and the state where the Mortgaged Property is located if the Mortgaged Property is not located in the State of New York in any actions, suits or proceedings arising out of or in connection with the Note or this Mortgage. In addition, the Mortgagor irrevocably and unconditionally waives any objection which the Mortgagor may now or hereafter have to the laying of venue of any of the aforesaid actions, suits, or proceedings arising out of or in connection with the Note or this Mortgage brought in any of the aforesaid courts, and hereby further irrevocably and unconditionally waives the right to plead or claim that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum; and

(b) the Mortgagor waives the requirements of personal service in connection with any actions, suits or proceedings arising out of or in connection with the Note or this Mortgage, and consents that all service of process may be made by certified mail, return receipt requested, addressed to the Mortgagor at the address of the Mortgagor set forth above in Paragraph 53 as such address may be changed as therein set forth.

59. Except to the extent that the law of the state where the Mortgaged Property is located must be applied because this Mortgage constitutes a lien on premises located in that state, this Mortgage shall be construed in accordance with the laws of the State of New York.

60. The Mortgagee shall, within thirty (30) days following written request therefor, but not more frequently than twice in any twelve month period, furnish to the Mortgagor a statement setting forth the principal balance then outstanding on the Note, accrued interest thereon to the date of the statement and the date to which such interest has been paid.

61. The Mortgagor will, at the request of the Mortgagee and at the cost and expense of the Mortgagor (a) promptly correct any defect, error or omission which may be discovered in the contents of this Mortgage, or in the execution, acknowledgment or recordation hereof, or (b) promptly do, execute, acknowledge and deliver any and all such further acts, deeds, conveyances, mortgages, deeds of trust, amendments, supplements, assignments, estoppel certificates, financing statements and continuations thereof, notices of assignment, transfers, certificates, assurances and other instruments as the Mortgagee may reasonably require from time to time in order to (i) effectuate the purposes of this Mortgage, (ii) subject to the lien and security interest hereby created any of the Mortgagor's properties, rights or interests covered or now or hereafter intended to be covered hereby, (iii) perfect and maintain such lien and security interest, or (iv) convey, grant, assign, transfer and confirm unto the Mortgagee the rights granted or now or hereafter intended to be granted to the Mortgagee hereunder or under any other instrument executed in connection with this Mortgage or which the Mortgagor may be or become bound to convey, mortgage or assign to the Mortgagee in order to carry out the intention or facilitate the performance of the provisions of this Mortgage.

IN WITNESS WHEREOF this Mortgage has been duly executed by the Mortgagor on the day and year first above written.

IN PRESENCE OF:

_____
GEOFFREY JAMES

State of New York)
                                ss.:
County of QUEENS)

On the 6 day of APRIL in the year 2007 before me, the undersigned, a Notary Public in and for said State, personally appeared GEOFFREY JAMES, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
Notary Public

Francine DiLeonardo
Notary Public State of New York
Certified In Nassau County
No. 01DI6091571
Commission Expires 200__

**SEAL**

Title No.:   REG15453

Commonwealth Land Title Insurance Company

### Schedule A Description

ALL that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the Borough of Brooklyn, County of Kings, City and State of New York, bounded and described as follows:

BEGINNING at the corner formed by the intersection of the northerly side of Hegeman Avenue with the westerly side of Pennsylvania Avenue;

RUNNING THENCE northerly along the westerly side of Pennsylvania Avenue, 25 feet;

THENCE westerly parallel with Hegeman Avenue, 90 feet;

THENCE southerly parallel with Pennsylvania Avenue, 25 feet to the northerly side of Hegeman Avenue;

THENCE easterly along the northerly side of Hegeman Avenue, 90 feet to the point or place of BEGINNING.

**For Information Only:**
**Said Premises also known as 718 Pennsylvania Ave, Brooklyn, NY 11354**

**District    Section    Block   4298  Lot  44**

Note: This commitment consist of insert pages labeled in Schedule A, Schedule A Description, Schedule B-Section 1, Mortgage Disposition, and Schedule B-Section 2  This commitment is of no force and effect unless all schedules are included, along with any Rider pages incorporated by reference in the insert pages.                    2

# Exhibit B
## (State Court Answer)

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS
--------------------------------------------------------------------
FLUSHING BANK, F/K/A FLUSHING SAVINGS
BANK, FSB,

                               Plaintiff,           **INDEX NO. 505735/2013**

                                                       **VERIFIED
ANSWER AND
COUNTER CLAIMS**

            -against-

**GEOFFREY JAMES, et al.**

                          **Defendants**
--------------------------------------------------------------------

        PLEASE TAKE NOTICE that the defendant GEOFFREY JAMES interposes the following verified answer, defenses and counter claims to the Complaint herein:

1. Lacks knowledge or information sufficient to form a belief as to the truth of the matters alleged in paragraph 1 of the complaint.

2. Denies the allegations contained in paragraph 2.

3. Paragraph 3 of the complaint contains no allegations requiring a response.

4. Lacks knowledge or information sufficient to form a belief as to the truth of the matters alleged in paragraph 4 of the complaint.

5. Paragraph 5 of the complaint contains no allegations requiring a response.

6. Admit so much of paragraph 6 of the complaint as alleges that Mr. James executed and delivered a mortgage in the amount $581,250.

7. Admit so much of paragraph 7 of the complaint as alleges that Mr. James executed and delivered an Adjustable Rate Mortgage Note in the amount $581,250.

8. Lacks knowledge or information sufficient to form a belief as to the truth of the matter alleged in paragraph 8 of the complaint.

9. Admit so much of paragraph 9 of the complaint as alleges that Mr. James executed and delivered an Adjustable Rate Mortgage Note in the amount $581,250.

10. Paragraph 10 of the complaint contains no allegations requiring a response.

11. Lacks knowledge or information sufficient to form a belief as to the truth of the matters alleged in paragraph 11 of the complaint.

12. Admit so much of paragraph 12 of the complaint as alleges that the mortgaged premises are commonly known as 718 Pennsylvania Avenue, Brooklyn, NY.

13. Lacks knowledge or information sufficient to form a belief as to the truth of the matters alleged in paragraph 13 of the complaint

14. Lacks knowledge or information sufficient to form a belief as to the truth of the matters alleged in paragraph 14 of the complaint.

15. Lacks knowledge or information sufficient to form a belief as to the truth of the matters alleged in paragraph 15 of the complaint.

16. Paragraph 16 is a request for relief and contains no allegations requiring a response.

17. Paragraph 17 is a request for relief and contains no allegations requiring a response.

18. Paragraph 18 is a request for relief and contains no allegations requiring a response.

19. Paragraph 19 is a request for relief and contains no allegations requiring a response.

20. Lacks knowledge or information sufficient to form a belief as to the truth of the matters alleged in paragraph 20 of the complaint.

21. Lacks knowledge or information sufficient to form a belief as to the truth of the matters alleged in paragraph 21 of the complaint.

22. Lacks knowledge or information sufficient to form a belief as to the truth of the matters alleged in paragraph 22 of the complaint.

23. Lacks knowledge or information sufficient to form a belief as to the truth of the matters alleged in paragraph 23 of the complaint.

24. Paragraph 24 contains no allegations requiring a response.

25. Paragraph 25 is a request for relief and contains no allegations requiring a response.

## PARTIES

26  At the time that GEOFFREY JAMES ("Mr. James" or "defendant") entered into the mortgage agreement with Flushing Savings Bank ("FSB" or "plaintiff") he was unsophisticated in financial matters.  Mr. James earned approximately $58,000 per year as an MTA employee for the City of New York.  Mr. James used the funds in his retirement account to purchase the home, which is the subject of this foreclosure action.

27. Mr. James resides at the property and the property contains four rental units.  The property is for personal use.

28. Plaintiff, Flushing Financial Corporation, is a savings and loan holding company. The primary business of the Company is the operation of its wholly owned subsidiary, Flushing Savings Bank, FSB (the Savings Bank). The Company's principal business is attracting retail deposits from the general public and investing those deposits together with funds generated from ongoing operations and borrowings, primarily in originations and purchases of multi-family residential properties and, one-to-four family (focusing on mixed-use properties, which are properties that contain both residential dwelling units and commercial units) and commercial real estate mortgage loans; construction loans,

primarily for residential properties; small business administration (SBA) loans and other small business loans.[1] On December 19, 2008 FSB took $70,000,000 (seventy million) in Troubled Asset Relief Program (TARP) funds from the U.S. government.[2] FSB's CEO, John Buran, said trouble spots in the portfolio were small commercial buildings and "multi-use" buildings containing stores and apartments.[3] FSB has been the subject of numerous public demonstrations because of the Bank's unwillingness to work with borrowers even though the U.S. taxpayers gave it a 70 million bailout.[4]

29  While Mr. James was looking for a mortgage, an acquaintance recommended, Tony Phillips, a mortgage broker to Mr. James to help him get the best possible deal on a mortgage loan. Mr. Phillips, through racial profiling and deceptive practices, induced Mr. James into taking out a high cost mortgage with FSB that benefited him and FSB financially, but was detrimental, injurious and costly to Mr. James.

## FACTS COMMON TO ALL DEFENSES AND COUNTERCLAIMS

30  Each year, predatory lending extracts billions of dollars of wealth from low income communities, depriving homeowners of their hard earned equity and vitiating the promise of financial security that is the cornerstone of homeownership. Predatory lenders target the equity, and ultimately the homes, of vulnerable homeowners by extending unaffordable loans packed with excessive fees and interest rates.

---

[1] http://topics.nytimes.com/top/news/business/companies/flushing-financial-corporation/
[2] http://money.cnn.com/news/specials/storysupplement/bankbailout/
[3] http://www.newsday.com/long-island/nassau/tarp-and-the-tale-of-two-long-island-banks-1.3589559
[4] http://www.qchron.com/editions/north/flushing-savings-bank-protesters-take-to-queens-streets/article_c16f722d-bb2a-587b-9b96-a8439c30a60d.html

31  At the time when Mr. James took out his mortgage with FSB, such predatory lenders

aggressively marketed an array of "exotic" or "non-traditional" loans to vulnerable

homeowners.  Many of these loans carried an interest rate that would increase on five

separate occurrences during the life of the loan, where the interest rate could reach

well over 12%, as in Mr. James's case.  Predatory lenders fuel this process by

rewarding mortgage brokers with an incentive structure that pays the broker more

through the yield spread premium ("YSP") for steering consumers into loans with

higher interest rates than they qualify for and less favorable terms such as prepayment

penalties -- this is exactly what happened to Mr. James.

32  Immediately *after* Mr. James closed on the property, a FSB employee took Mr. James

aside and told him that the fees charged by the mortgage broker were excessive.

Based upon information and belief, the YSP charged for the origination of the loan

even shocked an employee of plaintiff, was excessive, illegal and done obviously

with the knowledge of FSB.

33  The Harvard Law Review article, *Kickbacks or Compensation: The Case of Yield

Spread Premiums* by Howell E. Jackson and Jeremy Berry, concludes, based upon

their research, that high or excessive YSP are indicative of racial discrimination:

Our study also provides evidence that the payment of yield spread premiums
allows mortgage brokers to engage in price discrimination among borrowers. In
transactions where yield spread premiums are not at issue, the vast majority pay
mortgage brokers total compensation of not more than 1.5 percent of loan value,
and the largest group (on the order of 40 to 45 percent) pay mortgage brokers
compensation in the range of 1.0 to 1.5 percent of loan values. In other words, in
these markets, there is a pretty clear market price for mortgage broker services.
But, when yield spread premiums are present, there is no single market price for
mortgage broker services. Most borrowers pay more than 1.5 percent of loan
value; more than a third pay more than 2.0 percent of loan value; and roughly ten
percent pay more than 3.5 percent of loan value. This price dispersion strongly
suggests that yield spread premiums are not simply another form of mortgage

broker compensation, but rather that the payments constitute a deceptive device that the mortgage broker industry employs to extract unnecessary and excessive payments from unsuspecting borrowers. In an effort to corroborate the hypothesis that compensation practices of mortgage brokers disadvantage less well-educated and less financially sophisticated borrowers, we examined the relationship between mortgage broker compensation and the racial identity of borrowers. **The results indicated that mortgage brokers charged two racial groups – African-Americans and Hispanics – substantially more for settlement services than other borrowers.** For African Americans, the average additional charge was $474 per loan, and for Hispanics, the average additional charge the average additional charge was $580 per loan.[5] (emphasis supplied)

34  In this case, FSB was in on the price gouging and tacitly conceded the racial

discrimination by allowing the mortgage broker to over charge and fraudulently cause

Mr. James to enter into an agreement where he was unaware of significant costs and

fees.

35  Through repeated misrepresentations and inaccurate disclosures, FSB prevented Mr.

James from comprehending the truly destructive nature of the loan. Moreover, FSB

knew or should have known that the mortgage was unsuitable for Mr. James, who

they knew or should have known lacked the ability to repay the loan.

36  FSB knew of the price gouging, knew that this price gouging was done typically to

minorities such as Mr. James, but nevertheless did nothing about it because, based

upon information and belief, it was profitable for FSB to continue to discriminate

against borrows like Mr. James.

37  The appraisal obtained by FSB fraudulently inflated the value of the home causing

Mr. James to purchase a mortgage that was over priced by approximately $200,000.

38  Based upon the real estate website, "Zilliow", the value of Mr. James' home is

approximately $400,000.

---

[5] http://www.law.harvard.edu/faculty/hjackson/pdfs/january_draft.pdf, pg. 9

39  The mortgage that Mr. James purchased was for a total amount of $581,250.

40  Mr. James home is currently under water.

41  The inflated appraisal contributed significantly to the fraudulent scheme to induce Mr. James to enter into a high cost, toxic loan product, replete with hidden fees, costs, and an adjusting, exorbitant interest rate, and prepayment penalties.

42  Upon information and belief, FSB's appraisers justified the overly inflated appraisal through such tactics as using flipped property as comparables; omitting the full sales history of the subject property; misusing certain comparable properties that were of different construction or size; or citing as comparables homes in neighborhoods where property values were higher.

43  Directly as a result of FSB's actions, over appraising the property by $200,000 and steering Mr. James into a high cost loan based upon his race, he is now struggling to pay the fraudulently inflated mortgage payments and is at risk of losing his home.

44  Further, Mr. James did not receive a Good Faith Estimate of Settlement Costs until he was at the closing.  It was revealed at closing, the actual cost of the loan and that monthly payments were higher than he anticipated and higher than he could afford.

45  In Mr. James' case, FSB and the broker waited until the last minute and disclosed the YSP in the fine print only at closing, when it was too late for him to shop around and get a prime loan, instead of subprime, and to not have to pay a huge YSP.  What happened to Mr. James is a hallmark of predatory lending practices.

46  Mr. James appeared at the closing with an attorney, who upon information and belief, had previous business dealings with the mortgage broker and FSB.  At closing, Mr. James was given a pile of complex legal documents and was told to sign them by his

attorney. Very little explanation was provided to Mr. James as to what these documents meant. In reliance on the integrity of FSB and its representatives, he signed the note, mortgage and all other documents handed to him and which he was told to sign without understanding the terms.

47  The terms of the note are contrary to the representations FSB and the broker made to induce Mr. James to sign the note and other loan documents.

48  Mr. James was lured into entering an onerous and unconscionable loan through deceptive practices by both FSB and the mortgage broker.

49  At the time when FSB gave Mr. James an over half a million dollar mortgage, he was a city worker earning approximately $58,000, based upon information and belief, FSB made the loan to Mr. James based upon the value of the collateral rather than on his ability to pay the loan. Such underwriting practices are illegal.

50  Moreover, FSB's agents or employees fraudulently over valued the property by $200,000 causing Mr. James to enter into an inflated mortgage.

51  Predatory lending, depending upon how it is legislatively defined, implicates a comparatively narrower range of lender practices such as: loans made solely on the asset value of the collateral rather than on the borrower's ability to repay, loans whose margin rates exceed a certain high percentage, loan flipping (frequent refinancing that results in little or no economic benefit to the consumer), hidden costs, negative amortization issues, and inadequate disclosure of risks by the lender to the consumer.

52  Based upon information and belief, Mr. James was the victim of "reverse redlining" in the issuance of the mortgage. Where "redlining" is the practice of denying the extension of credit to specific geographic areas due to the income, race or ethnicity of

its residents, "reverse redlining is the practice of extending credit on unfair terms to those same communities" (*United Cos. Lending Corp. v Sargeant*, 20 F Supp 2d 192, 203, n 5, [D Mass 1998]).

53  In the NEDAP report, *Paying More For the American Dream*, it finds that, between 2006 and 2008, access to prime mortgage credit for both home purchase and refinance lending declined substantially in communities of color – more than twice as much as it did in predominantly white communities.  Prime refinance lending dropped even more dramatically in communities of color – almost five times more than in predominantly white neighborhoods. The four largest bank holding companies also significantly reduced their prime refinance lending in communities of color, even though they increased their prime refinance lending in predominantly white communities, and notwithstanding their receipt of TARP funds. Analysis of changes in prime, conventional mortgage lending between 2006 and 2008 in the seven cities reveals the following: Prime lending in communities of color decreased by 60.3 percent, compared to 28.4 percent in predominantly white neighborhoods.[6]

54  Mr. James's loan was originated during 2007 exactly during the time when prime lending in communities of color decreased by 60.3 percent.

55  Federal courts have held that reverse redlining claims are cognizable under the Federal Housing Act (FHA) (*see e.g. Hargraves v Capital City Mortgage Corp.*, 140 F Supp 2d 7, 20 [D DC 2000]; *Honorable v Easy Life Real Estate System*, 100 F Supp 2d 885, 892 [ND Ill 2000]). Where plaintiffs have raised reverse redlining claims, courts have identified a four-part test to determine whether the claim is sufficiently

---

[6] http://www.nedap.org/resources/documents/PayingMoreIV_Final.pdf

pleaded. The plaintiff must allege: (1) that she is a member of a protected class; (2) that she applied and was qualified for a loan; (3) that the loan was given on grossly unfavorable terms; and (4) that the lender either intentionally targeted her for unfair loans or currently makes loans on more favorable terms to others (*Hafiz v Greenpoint Mtge. Funding, Inc.*, 652 F Supp 2d 1039, 1045-1046 [ND Cal 2009]; *Matthews v New Century Page 6 Mtge. Corp.*, 185 F Supp 2d 874, 886 [SD Ohio 2002]).

56  In this case, Mr. James is an African American, and was an MTA employee with the City of New York at the time of the transaction. The property is located in East New York Brooklyn and is predominately a minority neighbor of color. Mr. James was a prime borrower who received a subprime loan, adjustable rate mortgage, replete with hidden fees, costs, pre-payment penalties and an interest rate that is currently at or above 9%. According to an on-line mortgage calculator, Mr. James' interest rate, beginning at the 144th payment will be over 9% and will adjust upward to at least 12%.

57  This court must follow the reasoning of *M & T Mtge. Corp. v Foy* (20 Misc 3d 274 [2008]), wherein the Supreme Court, Kings County (Kramer, J.) held that "a mortgage granted to a minority buyer for the purchase of property in a minority area which carries an interest rate that exceeds nine percent creates a rebuttable presumption of discriminatory practice" and that "the lender who has brought [a] proceeding to foreclose the mortgage must demonstrate by a fair preponderance of the evidence that the mortgage was not the product of unlawful discrimination" (*id.* at 275).

58  The instant mortgage is a subprime adjustable rate mortgage ("ARM") loan

(5+5+5+5+5 ARM/30 YR. AMORTIZATION). According to the Note, Mr. James

was required to pay principal and interest in the amount of $3,915.99 per month for

the first three years at 7.127%. Then, "on the First Adjustment Date until the fifth

(5th) anniversary date ("Second Adjustment Date") equal at all times to the greater of

(i)7.125% or (ii) 225 basis points in excess of the Bank's cost of borrowing five (5)

year money from the Federal Home Loan Bank of New York, as determined by the

Bank, as of sixty (60) days prior to the First Adjustment Date."  Further, every five

year interval thereafter (the second, third, fourth, fifth and sixth terms), interest would

adjusted to an interest rate equal to the greater of the prior term's interest rate or "225

basis points in excess of the Bank's cost of borrowing five (5) year money from the

Federal Home Loan Bank of New York, as determined by the Bank, as of sixty (60)

days prior" to the adjustment date.

59  As shown below, ARM loans have been universally condemned both nationally and

by the New York State Legislature, as contributing to the start of the current

foreclosure crisis and its perpetuation into the reasonably foreseeable future.  U.S.

Senator Christopher Dodd (D-Connecticut), Chairman of the Senate Committee on

Banking, Housing and Urban Affairs, in his opening statement at the March 22, 2007

Committee hearing on "Mortgage Market Turmoil: Causes and Consequences," stated

that "[o]ur mortgage system appears to have been on steroids in recent years, giving

everyone a false sense of invincibility." He went on to strongly criticize ARM loans,

referring to them as **"unconscionable and deceptive."**  (emphasis supplied)

60  In Mr. James' loan there is even a prepayment penalty, which is not labeled as such, however, it is 5% of the total due on the mortgage.  In other words, Mr. James would be penalize if he were able to refinance out of this toxic, destine to fail mortgage product.  Tellingly, when Mr. James attempted to refinance out of this toxic mortgage product, FSB refused to allow him to refinance.

61  Further there is a late charge of 8% added to the 7%, the current interest rate on this loan, which is far above the 9% that would trigger the presumption that this is a predatory loan product intentionally sold to a minority for a home in a minority neighbor.

62  The Mortgage states the "Default Rate" is 24%, section 7.2, and the complaint alleges the loan is in default.  Currently, the interest rate is far above 9% and a presumption that this is a predatory loan targeted to a minority should be made by this court.

63  Nowhere in the loan documents does it state that this a "commercial" loan. Nevertheless, plaintiff proceeds as if this a commercial foreclosure.

64  Plaintiff failed to comply with the notice required by RPAPL §§1304 and 1320.

65  Plaintiff breached it's contract with Mr. James when it failed to negotiate in good faith and utilized Mr. James' good faith negotiations to amend it's complaint to include a cause of action for a deficiency judgment.

66  Further, plaintiff's amended complaint has been rejected as late.

67  Plaintiff's demand for a deficiency judgment has no basis in equity since it's agents and/or employees fraudulently inflated the value of the home by intentionally over appraising the property by approximately $200,000  thereby causing Mr. James to enter into a grossly inflated mortgage and note.

12

68  FSB's fraudulent and deceptive actions violated numerous federal and state consumer

protection laws, including the Truth in Lending Act, the New York State Deceptive

Practices Act; the New York State usury law; the common law doctrines of fraud and

conspiracy to commit fraud; RAPAL, Bank Law, RESPA, the Federal Equal Credit

Opportunity Act; the Federal Fair Housing Act; the Civil Rights Act; NYS Human

Rights Law; Title 8 of the NYC Administrative Code; the common law doctrine of

Unclean Hands and Breach of the Duty of Good Faith and Fair Dealing.

### FIRST AFFIRMATIVE DEFENSE
### (Failure to State a Cause of Action)

69  Defendant, Mr. James, repeats and realleges paragraphs "1" through "68" as if fully

set forth herein.

70  The complaint should be dismissed for failure to state a cause of action.

### SECOND AFFIRMATIVE DEFENSE AND FIRST COUNTERCLAIM
### (GBL §349 – Deceptive Acts and Practices)

71  Defendant, Mr. James, repeats and realleges paragraphs "1" through "70" as if fully

set forth herein.

72  Upon information and belief, plaintiff at all relevant times "conducted a business"

and/or "furnished a service" as those terms are defined in the New York State General

Business Law § 349 ("the Deceptive Practices Act").

73  Plaintiff and/or its agents violated the Deceptive Practices Act by engaging in acts

and practices that were misleading in a material way, unfair, deceptive, and contrary

to public policy and generally recognized standards of business, including, but not

limited to, misrepresenting the actual terms of the loan prior to the closing, inducing

Mr. James through reliance upon its agents and employees into a fraudulent scheme

13

to enter into a loan that was highly detrimental to his interests, by misrepresenting the true costs of the loan, fraudulently inflating the value of the home, lending to Mr. James on the basis of race and misrepresenting other significant terms of the loan.

74   On information and belief, plaintiff and its agents, as a regular part of their business, and for the purposes of inducing consumers of color to enter loans that yielded plaintiff huge profits, but such loans failed to disclose properly and accurately the amount financed, the finance charge fees payable to third parties that were not bona fide or reasonable in amount as required by 15 U.S.C. § 1638(a)(3) and 12 C.F.R. §§ 226.4 and 226.18(d); by failing to disclose properly and accurately the "annual percentage rate" in violation of 15 U.S.C. §1638(a)(4) and 12 C.F.R. § 226.18(e); by failing to provide two copies of the notice of the right to rescind and an accurate date for the expiration of the rescission period in violation of 15 U.S.C. § 1635 and 12 C.F.R. § 226.23(b) and misrepresenting to Mr. James the cost of the loan by failing to provide him with a "Good Faith Estimate" prior to the closing date, as required by federal law.

75   Upon information and belief, the deceptive acts and practices described herein were consumer-oriented, and had a broad impact on consumers at large.

76   As a direct result of the deceptive and misleading statements and actions by FSB and/or its agents and employees, Mr. James is now in imminent danger of losing his home and all of the funds he invested in it.  He suffered serious injury as the proximate result of the deceptive practices committed by said parties.  The deceptive practices committed by said parties have had and may continue to have a broad impact on consumers throughout New York State.

77  Plaintiff is liable for the aforesaid deceptive practices, and plaintiff should therefore be enjoined under N.Y. Gen. Bus. L. § 349(h) from enforcing the note and mortgage. In addition Plaintiff and/or its agents should be enjoined under N.Y. Gen. Bus. L. § 349(h) from engaging in such practices in the future.

78  Plaintiff is also liable to Mr. James for:

    a.    actual damages in an amount to be determined at trial; and

    b.    costs and disbursements.

## THIRD AFFIRMATIVE DEFENSE AND SECOND COUNTERCLAIM
### (Common Law Fraud)

79  Defendant, Mr. James, repeats and realleges paragraphs "1" through "78" above as if fully set forth herein.

80  Plaintiff and its employees and/or agents, Tony Phillips, fraudulently and knowingly induced Mr. James to enter into an unconscionable mortgage loan by the above-mentioned misrepresentations and/or failures to provide material information, including failing to inform Mr. James of hidden fees and costs until the closing thereby precluding him from shopping around to ensure the best possible mortgage pricing available to him.

81  An FSB employee was so shocked at the fees charged to Mr. James that after the closing she informed him that he was over charged by the mortgage broker.

82  Further, plaintiff and its employees and/or agents, fraudulently inflated the value of the home by creating an appraisal that valued the home by approximately $200,000 more than it was worth thereby causing Mr. James to enter into a mortgage that was over valued by $200,000.

15

83  Mr. James suffered serious injury as the proximate result of his reliance on misrepresentations and failures to disclose the actual terms of the loan by Plaintiff and its agents and/or employees.  The actions of plaintiff, its employees and agents were willful and knowing.  As a result of the aforesaid fraud, the loan transaction and mortgage entered into by Mr. James should be declared null and void, and the security interest created under the transaction should be terminated.  In addition, plaintiff and it's agents are liable to Mr. James for:

    a.    actual damages in an amount to be determined at trial;

    b.    punitive damages; and

    c.    costs and disbursements.

### FOURTH AFFIRMTIVE DEFENSE AND THIRD COUNTERCLAIM
### (Civil Conspiracy to Commit Fraud)

84  Defendant, Mr. James, repeats and realleges paragraphs "1" through "83" as if fully set forth herein.

85  Plaintiff entered into an agreement to induce Mr. James to enter the April 6, 2007 equitable mortgage.

86  Plaintiff intentionally, knowingly and willfully participated in this scheme by committing overt acts and making misrepresentations and/or failing to provide material information, in furtherance of the agreement, including but not limited to those representations set forth in paragraphs 30 - 68.

87  Mr. James suffered serious injury as the proximate result of his reliance on plaintiff's misrepresentations and omissions.

88  Said co-conspiracy renders void and unenforceable the April 6, 2007 equitable mortgage.

89  In addition, plaintiff is liable to Mr. James for: (a) actual damages; (b) punitive

damages; (c) costs and disbursements; and (d) attorney's fees.

### FIFTH AFFIRMATIVE DEFENSE AND FOURTH COUNTERCLAIM
### (Aiding and Abetting Fraud)

90  Defendant, Mr. James, repeats and realleges paragraphs "1" through "89" as if fully

set forth herein.

91  At all times relevant hereto, FSB, by and through its affiliates, divisions, enterprises,

representatives, employees, and agents, knowingly and willfully aided and abetted the

fraudulent inducement into an unconscionable mortgage by the scheme described

above, see paragraphs 30 through 68.

92  FSB's agents' actions, Tony Phillips and their hired appraiser, were taken with full

knowledge and acceptance of FSB.

93  FSB aided and abetted the scheme to defraud Mr. James by providing substantial

assistance to Tony Phillips by not informing Mr. James of the hidden fees he was

charged until after the closing when it was too late for Mr. James to shop around for a

better mortgage.

94  FSB aided and abetted the scheme to defraud Mr. James by providing substantial

assistance to their appraiser by accepting as true and accurate the over appraised

value of the property.

95  FSB through its employees obtained actual knowledge of the fraudulent scheme

describe above by: being present at the closing where an FSB employee told Mr.

James after the closing of the exorbitant hidden costs and fees in the mortgage loan

and by preparing loan documents replete with misrepresentations and which relied

upon an overly inflated fraudulent appraisal.

96  Said aiding and abetting renders void and unenforceable the April 6, 2007 equitable mortgage.

97  In addition, plaintiff is liable to Mr. James for: (a)actual damages; (b) punitive damages; (c) costs and disbursements; and (d) attorney's fees.

## SIXTH AFFIRMATIVE DEFENSE AND FIFTH COUNTERCLAIM
### (Common Law Unconscionability)

98  Defendant, Mr. James, repeats and realleges paragraphs "1" through "97" as if fully set forth herein.

99  Prior to and during the time of the loan transaction, there existed a large disparity in bargaining power between Mr. James and plaintiff its agents and/or employees.  Mr. James is unsophisticated in financial matters, while plaintiff is a sophisticated player in the finance industry, which sought to profit directly from the disparity in bargaining power.

100    Plaintiff used this disparity in bargaining power to induce Mr. James to enter into an unconscionable mortgage loan agreement and has now put him in jeopardy of losing his home.

101    Plaintiff knew of the exorbitant hidden fees and costs in Mr. James loan, but choose to inform him after closing of such fees leaving him unable to shop around for better mortgage terms.

102    Based upon information and belief, FSB knew that its appraiser over valued the property by $200,000 which caused Mr. James to entered into a mortgage that was detrimental to him and extremely over inflated.

18

103     Based upon information and belief, FSB made the loan to Mr. James based upon the value of the property rather than his ability to pay, such underwriting practices are illegal and the hallmark of predatory lending.

104     Further, plaintiff is seeking a deficiency judgment even though it procured a fraudulent appraisal whereby it over inflated the true value of the property and caused Mr. James to enter into an over priced mortgage where, to-date, the value of the home is approximately $200,000 less the amount due on the mortgage.

105     Based upon information and belief, FSB seeks a deficiency judgment based upon duplicitous means.

106     Mr. James was induced to enter into this mortgage by FSB's agents and/or employees where he was required to make a nominal down payment, 3%, and based upon information and belief, was given a loan based upon the collateral and not upon Mr. James ability to pay the loan, since he was earring $58,000 per year at the time as a City employee and the mortgage was for over $581,000. Based upon information and belief, FSB knew Mr. James would not be able to refinance out of this toxic loan product, that he would never be able to continue to make payments on this mortgage and furthermore, would never be able to make payments after the mortgage adjusted upward, and knew foreclosure would be inevitable, but nonetheless, gave Mr. James a mortgage. Such practices are considered predatory.

107     Said unconscionability renders void and unenforceable the mortgage loan transaction which is the subject of this action.

**SEVENTH AFFIRMATIVE DEFENSE**
**(High-Cost/Subprime Home Loans, RPAPL § 1302,**
**Bank Law § 6-1, § 6-m, §595-a)**

108    Paragraphs 1 through 107 are re-alleged as if repeated herein.

109    Plaintiff, in its complaint, must affirm that it is the owner and holder of the note and mortgage or has been delegated the authority to foreclose by the owner and holder of the note and mortgage and has complied with Bank Law § 6-1, § 6-m, §595-a, and RPAPL § 1304.

110    Plaintiff has failed to comply with Bank Law § 6-1, § 6-m, §595-a, and RPAPL § 1304.

## EIGHTH AFFIRMATIVE DEFENSE
### (Failure to Comply With Notice Requirement of RPAPL § 1303)

111    Paragraphs 1 through 110 are re-alleged as if repeated herein.

112    Plaintiff did not serve the Notice "Help for Homeowners in Foreclosure" as prescribed by Section 1303 of the Real Property Action and Proceedings Law.

113    Strict compliance with RPAPL §1303 is a necessary condition precedent to a foreclosure action.

## NINTH AFFIRMATIVE DEFENSE
### (Failure of statutory condition precedent under RPAPL § 1304)

114    Paragraphs 1 through 113 are re-alleged as if repeated herein.

115    Plaintiff did not serve the 90-day pre-foreclosure notice in the matter prescribed by Section 1304 of the Real Property Action and Proceedings Law.

116    Strict compliance with RPAPL §1304 is a necessary condition precedent to a foreclosure action.

## TENTH AFFIRMATIVE DEFENSE

20

**(Failure of statutory condition precedent, Summons
Notice, under RPAPL § 1320)**

117        Paragraphs 1 through 117 are re-alleged as if repeated herein.

118        Plaintiff did not serve the required notice in the matter prescribed by

Section 1320 of the Real Property Action and Proceedings Law.

119        Strict compliance with RPAPL §1320 is a necessary condition precedent

to a foreclosure action.

**ELEVENTH ARRIMATIVE DEFENSE AND SIXTH
COUNTERCLAIM
(Federal Truth In Lending Act)**

120    Mr. James reasserts and realleges paragraphs "1" through "119" as though fully

set forth herein.

121    Upon information and belief, at the time of the subject transaction, plaintiff and

their agents and/or assigns acted as creditors who regularly engaged in the making of

(equitable) mortgage loans, payable by agreement in more than four installments or

for which the payment of a finance charge is or may be required, whether in

connection with loans, sales of property or services, or otherwise. Accordingly,

plaintiff is subject to the Truth in Lending Act ("TILA") 15 U.S.C. § 1601 *et seq.* and

it implementing regulations, Federal Reserve Board Regulation Z, 12 C.F.R. § 226.

122    As a result of the subject transaction, plaintiff acquired an interest in defendant's

home that secures payment or performance of an obligation.

123    Upon information and belief, in the course of the April 6, 2007 consumer credit

transaction described above, plaintiff violated the disclosure and rescission

requirements of TILA and Regulation Z in the following and other respects:

21

a.    By failing to disclose properly and accurately the amount financed, in violation of 15 U.S.C. § 1638(a)(2) and 12 C.F.R. § 226.18(b);

b.    By failing to disclose properly and accurately the finance charge fees payable to third parties that were not bona fide or reasonable in amount, as required by 15 U.S.C. § 1638(a)(3) and 12 C.F.R. §§ 226.4 and 226.18(d);

c.    By failing to disclose properly and accurately the "annual percentage rate", in violation of 15 U.S.C. § 1638(a)(5) and 12 C.F.R. § 226.18(h);

d.    By failing to disclose properly and accurately the "total of payments" in violation of 15 U.S.C. § 1638(a)(5) and 12 C.F.R. § 226.18(h);

e.    By failing to disclose properly and accurately the number, amount, and due dates or period of payments scheduled to repay the obligation in violation 15 U.S.C. § 1638(a)(6) and 12 C.F.R. § 226.18(g);

f.    By failing to disclose that a security interest was taken in the subject property in violation of 15 U.S.C. § 1638(a)(9) and 12 C.F.R. § 226.18(m);

g.    By failing to provide two copies of the notice of the right to rescind and an accurate date for the expiration of the rescission period in violation of 15 U.S.C. § 1638(a)(9) and 12 C.F.R. § 226.18(m).

124    The above violation of the Truth in Lending Act give defendant an extended right to rescind the equitable loan held by plaintiffs pursuant to 15 U.S.C. § 1635 & 1641(d)(1) and 12 C.F.R. § 226.23.

125    In addition, plaintiff is liable to defendant for: the termination of plaintiff's security interest in the property; actual damages in an amount to be determined at

trial; statutory damages as provided by 15 U.S.C. § 1640; costs and disbursements and attorney's fees.

## TWELVETH ARRIMATIVE DEFENSE AND SEVENTH COUNTERCLAIM
### (REAL ESTATE SETTLEMENT PROCEDURES ACT)

126    Mr. James reasserts and realleges paragraphs "1" through "125" as though fully set forth herein.

127    On April 6, 2007 equitable mortgage transaction described above, is a loan secured by a first lien on a four-family residential property.

128    Upon information and belief, plaintiff is a creditor who makes or invest in (equitable) mortgage loans aggregating more than $1,000,000 per year.

129    The equitable mortgage transaction described above is a "federally related mortgage loan" as defined in 12 C.F.R. § 2602(1), and therefore is subject to the Real Estate Settlement Procedures Act ("RESPA"), 12 C.F.R. § 2602 *et seq.*

130    Plaintiff violated RESPA with respect to Mr. James' loan transaction by: (a) giving or accepting kickbacks or other things of value to plaintiff's agents and/or assigns, Tony Phillips and others in violation of 12 C.F.R. § 2607(a) and 24 C.F.R. § 3500.14(c); and (b) giving a portion, split, or percentage of charges made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed, in violation of 12 C.F.R. § 2607(a) and 24 C.F.R. § 3500.14(c).

131    Plaintiff is liable to Mr. James for: actual damages, treble damages under 12 C.F.R. § 2607(d)(2), costs and disbursements and attorneys' fees.

## THIREETH AFFIRMATIVE DEFENSE AND EIGHTH COUNTERCLAIM
### (Federal Equal Credit Opportunity Act, 15 U.S.C. § 1691(a))

132    Mr. James reasserts and realleges paragraphs "1" through "131" as though fully set forth herein.

133    Plaintiff their principals, agents and employees, discriminated against Mr. James with respect to a credit transaction in violation of Equal Credit Opportunity Act ("ECOA") by extending, arranging and purchasing/assigning Mr. James an injurious home mortgage loan on the basis of race and color.

134    Upon information and belief, FSB and its agents in the ordinary course of business, regularly target applicants or prospective applicants on the basis of race and color.

135    Such activities constitute a pattern and practice of credit discrimination by "reverse redlining," targeting individuals on the basis of their race, color, and their neighborhoods of residence to induce them to enter injurious home mortgage loans. These actions were taken deliberately and with racially discriminatory intent, with reckless disregard for Mr. James' rights.

136    In addition, plaintiff and its agents engaged in a pattern of discriminatory practices related to housing that resulted in a disparate impact to the detriment of non-white homeowners in communities of color throughout New York City.

137    As a proximate result of the racially discriminatory action of FSB, Mr. James has suffered economic loss, mental anguish, deprivation of civil rights, and the prospective loss of his home.

138    Therefore, plaintiff is liable to Mr. James for:

a) actual damages in an amount to be determined at trial;

b) punitive damages in an amount not greater than $10,000, as provided by 15 U.S.C. §1691(e); and

c) costs and disbursements.

## FOURTHEENTH ARRIMATIVE DEFENSE AND NINTH COUNTERCLAIM
### (Federal Fair Housing Act, 42 U.S.C. §§3604, 3605)

139    Mr. James reasserts and realleges paragraphs "1" through "138" as though fully set forth herein.

140    Plaintiff its agents, principals and employees, discriminated against Mr. James on the basis of race and color in a residential real estate-related transaction in violation of the federal Fair Housing Act, 42 U.S.C. § 3605, and the corresponding regulations, including 24 C.F.R. § 100.125.  FSB discriminated against Mr. James by providing to him grossly inferior terms and conditions in the loan transaction on the basis of his race and color; providing information to him which was inaccurate or different from that provided to others, on the basis of her race and color; and fixing the loan amount based upon a fraudulent inflated property value, interest rate, and other terms of the loan based on his race and color.  Plaintiff and its agents discriminated against Mr. James by imposing different terms or conditions for purchasing loans because of race or color; making loans in certain communities or neighborhoods but not in others because of race or color; and pooling or packaging loans differently because of race or color.

141    These actions were taken deliberately and with racially discriminatory intent and with reckless disregard for Mr. James' rights.  These actions constituted "reverse redlining" in violation of the Fair Housing Act, 42 U.S.C. § 3604.

142    In addition, plaintiff and third party defendants engaged in a pattern of discriminatory practices related to housing that resulted in a disparate impact to the detriment of non-white homeowners in communities of color throughout New York City.

143    As a proximate result of such discriminatory housing practice, Mr. James has suffered economic loss, mental anguish, deprivation of civil right's and the prospective loss of his home.

144 ·    As a result of the aforesaid violations of the Fair Housing Act, this court should enjoin plaintiff from enforcing the mortgage and note. In addition, plaintiff is liable for:

a) actual and punitive damages in an amount to be determined at trial; and costs and disbursements.

## FIFTITEEN ARRIRMATIVE DEFENSE AND TEN COUNTER CLAIM (DEPRIVATION OF CIVIL RIGHTS IN VIOLATION OF 42 U.S.C. §§§ 1981, 1982, 1985)

145    Defendant, Mr. James repeats and realleges paragraphs "1" through "144" as if fully set forth herein.

146    FSB by their actions described above, exploited the segregated, dual housing market that exits in New York City, seeking out buyers who will accept unreasonable terms and conditions of sale and financing. Such actions were taken deliberately and with racially discriminatory intent, and with reckless disregard for Mr. James's rights.

147    This racially discriminatory pattern of acts and conduct constitutes "reverse redlining" and denied Mr. James the same rights to make and enforce contracts and to

enjoy the full and equal benefit of the laws, as are enjoyed by white citizens of the United States in violation of 42 U.S.C. § 1981.

148    Furthermore, such acts and conduct denied plaintiff the same rights to inherit, purchase, lease, sell, hold and convey real property, as are enjoyed by white citizens of the United States in violation of 42 U.S.C. § 1982.

149    Finally, such pattern of actions constituted a conspiracy for the purpose of depriving plaintiff of the equal protection of the laws, or of equal privileges and immunities of the laws of the United States, in violation of 42 U.S.C. § 1985(3).

150    As a proximate result of these racially discriminatory actions, Mr. James has suffered economic loss, mental anguish, deprivation of civil rights, and the prospective loss of him home.

151    FSB's actions were intentional, wanton, malicious and in violation of the public interest and entitle Mr. James to punitive damages.

### SIXTEETH AFFIRMATIVE DEFENSE AND ELEVETH COUNTER CLAIM
(New York State Human Rights Law, Executive Law §296(5))

152    Mr. James, repeats and realleges paragraphs "1" through "151" as if fully set forth herein.

153    FSB and their employees and principals, through their actions described above, have engaged in a pattern of "reverse redlining" discrimination in violation of the New York State Human Rights Law, Executive Law §296. Such actions include discriminating in the terms, conditions or privileges of sale, and services in connection with the sales and financing transactions. Such actions were taken

deliberately and with racially discriminatory intent, with reckless disregard for Mr.

James's rights.

154    In addition, FSB engaged in a pattern of practices related to extending credit that

resulted in a disparate impact to the detriment of non-white prospective homebuyers

in, and residents and wood-be residents in, communities of color thought New York

City.

155    As a proximate result of these racially discriminatory actions Mr. James has

suffered economic loss, mental anguish, deprivation of civil rights, and the

prospective loss of his home.

156    FSB's actions were intentional, wanton, malicious and in violation of the public

interest and entitle Mr. James to punitive damages.

## SEVENTHEETH AFFIRMATIVE DEFENSE AND TWELVETH COUNTER CLAIM
### (Title 8 of the New York City Administrative Code)

157    Mr. James, repeats and realleges paragraphs "1" through "156" as if fully set forth

herein.

158    FSB through their actions described above, have engaged in and/or aided and

abetted a pattern of "reverse redlining" discrimination in violation of Title 8 of the

New York City Administrative Code, including NYC Admin. Cod §§8-107.5 and 8-

107.6, against Mr. James.  Such actions include targeting victims on the basis of race

and color, discriminating in the terms, conditions or privileges of sale, and in the

furnishing of services in connection with sale and financing transactions; and

discriminating in the granting, withholding, extending or renewing, or fixing of rates,

terms or conditions of financial assistance and in the appraisal of housing.  Such

28

actions were taken deliberately and with racially discriminatory intent, and with reckless disregard for Mr. James rights.

159    In addition, FSB engaged in a pattern of practices related to housing that resulted in a disparate impact to the detriment of non-white prospective homebuyers in, and residents and would be residents in, communities of color through New York City.

160    As a proximate result of these racially discriminatory actions, Mr. James has suffered economic loss, mental anguish, deprivation of civil rights, and the prospective loss of his home.

161    FSB's actions were intentional, wanton, malicious and in violation of the public interest and entitle Mr. James to punitive damages.

### EIGHTEENTH AFFIMATIVE DEFENSE AND THIREETH COUNTERCLAIM
### (Lack of Standing)

162    Mr. James reasserts and realleges paragraphs "1" through "161" as though fully set forth herein.

163    To maintain a foreclosure action under New York state law, the plaintiff must own both the mortgage and the note or be in possession of both the mortgage and note prior to commencement of the action.  Based upon information and belief, FSB does not own the note and mortgage.

### NINTEETH AFFIRMATIVE DEFENSE
### (UNCLEAN HANDS)

164    Mr. James realleges paragraphs "1" through " 163" the foregoing as though fully set forth herein.

165    Plaintiff is liable for the conduct of its agents and employees.

166    Plaintiff's agents, in their dealings with Mr. James relating to his

29

efforts to obtain a mortgage and right to obtain accurate information about the mortgage product he was purchasing, plaintiff's agents it appraiser, closing employee and Tony Phillips, the mortgage broker and others, engaged in unconscionable, immoral and inequitable conduct that injured Mr. James.

167    Further, through duplicity, breach of the requirement of good faith and fair dealing, and the filing of a late amended complaint, which was rejected by defendant, plaintiff demands a deficiency judgment.

168    As a consequence of plaintiffs wrongful conduct toward Mr. James, plaintiff is not entitled to the equitable remedy of foreclosure nor a deficiency judgment.

169    Accordingly, the Court should dismiss plaintiff's claims against Mr. James in their entirety.

### TWENTH AFFIRMATIVE DEFENSE AND FOURTHEETH COUNTERCLAIM
### (Breach of Duty of Good Faith and Fair Dealing)

170    Mr. James repeats and realleges paragraphs "1" through "169" as though fully set forth herein.

171    Plaintiff FSB is liable for the conduct of its agents and employees.

172    Underlying all contracts is the implied covenant of good faith and fair dealing which binds all parties in carrying out performance of the contract.

173    FSB, by unconscionable and deceptive means and tactics induced Mr. James into entering into a mortgage loan with hidden costs, fees, prepayment penalties and an interest rate that could potentially exceed the usuary rate of 16%.

174    As a direct result of FSB's unconscionable and deceptive tactics Mr. James has

been deprived of the fruits of their bargain with the originating lender, because he

was prevented and blocked from exercising his right to get fair credit without

hidden fees, and costs and an interest rate that would eventually lead to foreclosure,

and through duplicity means caused Mr. James to enter into a mortgage that is over

inflated by approximately $200,000.

175    Because of its breach of the implied covenant of good faith and fair dealing, FSB

is not entitled to the equitable remedy of foreclosure.

176    As a result of its breach of its implied covenant of good faith and fair dealing

with defendant, plaintiff is liable to defendant for: all damages proximately caused

by the breach, including but not limited to injury caused by such a toxic loan

product, credit damage, lost opportunity costs, and emotional distress, costs and

disbursements, and reasonable attorney's fee's

WHEREFORE, Mr. James requests that this Court:

a.    Dismiss the action in its entirety;

b.    Rescind the April 7, 2007 equitable mortgage transaction and terminate

any security interest in defendant's property created by the transaction;

c.    Award actual damages in an amount to be determined at trial;

d.    Award statutory damages as set forth above;

e.    Award punitive damages in an amount to be determined at trial;

f.    Award reasonable costs of this action and attorney's fess as set forth

above;

31

 g.    Enjoin plaintiff from engaging in deceptive acts and practices that affect consumers in New York State under N.Y. General Business Law § 349(h);

h.    Award such other and further relief as this Court deems just and proper.

Dated: New York, New York
January 6, 2014

Law Office of Susan Pepitone
Attorney for Defendant,
**GEOFFREY JAMES**

By: Susan Pepitone, Esq.
Law Office of Susan Pepitone
110-23 70th Road
Forest Hills, NY  11375
(718) 544-1122 phone/fax
susanpepitone@nyc.rr.com

TO:    JASPAN SCHLESINGER, LLP
Antonia M. Donohue, Esq.
Attorneys for Plaintiff
300 Garden City Plaza
Garden City, NY  11530-3324
(516) 746-8000

## VERIFICATION

State of New York                    )        ss.:
County of New York                   )

SUSAN PEPITONE, being an attorney duly admitted to practice in all Courts of the State of New York, not a party to the within action affirms the following as true under the penalties of perjury:

That I am the attorney of record for GEOFFREY JAMES the defendant in the within action; I have read the foregoing Answer and Counter-Claims and know the contents thereof; the same is true to my own knowledge, except as to the matters therein stated to be alleged on information and belief, and as to those matters I believe it to be true. The reasons this verification is made by me and not by the aforesaid defendant is that he resides in a county other than where I have my office.

The grounds of my belief as to all maters not stated upon my own knowledge are as follows: Notes of conversations with GEOFFREY JAMES and file.

Susan Pepitone, Esq.

Dated:  January 6, 2014